FORMER EMPLOYEES OF MARA-
THON ASHLAND PIPE LINE
LLC, Plaintiffs–Appellees,

v.

Elaine CHAO, Secretary of Labor,
Defendant–Appellant.

No. 03–1556.

United States Court of Appeals,
Federal Circuit.

June 14, 2004.

Marianne Rowden, Katten Muchin Zavis Rosenman, of Chicago, IL, argued for plaintiff-appellee. With her on the brief was James L. Sawyer.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were Peter D. Keisler, Assistant Attorney General; and David M. Cohen, Director.

Before LOURIE, CLEVENGER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This is a government appeal from an order of the Court of International Trade. The trial court directed the Secretary of Labor to certify eight former employees of Marathon Ashland Pipe Line LLC as eligible for statutory benefits that are available to employees who lose their jobs because of competition from imported goods. Because we conclude that substantial evidence supports the Secretary's determination that the former employees were not engaged in the production of crude oil, we reverse the trial court's ruling to the contrary.

I

Marathon Ashland Pipe Line is a subsidiary of Marathon Ashland Petroleum LLC, which is a partnership owned by Marathon Oil Company and Ashland Inc. The eight former employees worked as "gaugers" for Marathon Ashland Pipe Line. In that capacity, they were responsible for performing quality control on crude oil that was purchased from independent crude oil producers in the Illinois Basin oil field in Bridgeport, Illinois. Their main responsibility was to test the crude oil that had been gathered from the independent producers and stored in tanks. Once the crude oil was tested and verified for quality, it would be released for shipment to third-party purchasers or to the parent company's refinery in Robinson, Illinois.

In 1999, the division of Marathon Ashland Pipe Line for which the employees worked was sold. As a result of the sale, the eight employees lost their jobs. Because the sale occurred close in time to announcements that Marathon undertook to purchase crude oil from outside the United States, the employees contended that Marathon's increased importation of foreign crude oil contributed to the loss of their jobs.

Members of the employees' union filed with the United States Department of Labor a petition seeking benefits for the employees under chapter 2 of title II of the Trade Act of 1974, Pub.L. No. 93–618, 88 Stat.2019–30 (1975) (codified as amended at 19 U.S.C. §§ 2271–2395 (2000)). That statute provides that workers who lose their jobs because of competition from imported goods may be eligible for certain monetary, training, and employment service benefits, referred to collectively as "adjustment assistance." The statute assigns to the Secretary of Labor the responsibility to certify workers as eligible for adjustment assistance if the Secretary determines that a significant number of workers in a firm or subdivision have lost their jobs because of competition from imported goods and if certain other criteria are met. 19 U.S.C. § 2272 (2000).

The petition asserted that the employees lost their jobs because their employer's parent company increased its importation of crude oil and converted its Robinson, Illinois, refinery to process the imported crude oil, thereby reducing its need for crude oil from the Illinois Basin oil field. In response to the petition, the Secretary of Labor conducted an investigation, which consisted mainly of sending an inquiry to Marathon Ashland Pipe Line's human resources representative asking for information regarding the firm's organizational structure, sales, production, employment, and imports.

In December 1999, the Secretary issued a negative determination, in which the Secretary concluded that the employees were not eligible for adjustment assistance. In the denial notice accompanying the decision, the Secretary explained that the petitioning employees were not eligible for adjustment assistance because their company performed a service, namely "trans-

porting crude oil and petroleum products via pipeline," rather than producing an article, as required by the statute. The Secretary explained that the employees of Marathon Ashland Pipe Line would be eligible for adjustment assistance only if "their separation was caused importantly by a reduced demand for their services from a parent firm, a firm otherwise related to the subject firm by ownership, or a firm related by control." In addition, the Secretary stated, "the reduction in demand for services must originate at a production facility whose workers independently meet the statutory criteria for certification and the reduction must directly relate to the product impacted by imports." According to the Secretary, those conditions were not met for the employees on whose behalf the petition had been filed.

The employees requested reconsideration of the Secretary's noncertification decision, pointing out that in their capacity as gaugers they tested the crude oil produced by independent producers in the Illinois Basin field before it was transported in the Marathon Ashland pipeline. They also noted that the crude oil acquisition department of the parent company, Marathon Oil Company, worked directly with the gaugers in setting the parameters for the acceptance or rejection of the crude oil that was to be transported either to the Marathon refinery or to third-party purchasers. Finally, they argued that the employees' layoffs had been caused by a reduced demand for services by the parent company and that the employees qualified for adjustment assistance on that ground as well.

The Secretary denied reconsideration. The Secretary noted that amendments to the adjustment assistance statute made in 1988 extended the Act's coverage to workers engaged in exploring and drilling for crude oil and natural gas, but not to work-

ers engaged in transporting crude oil or natural gas after its extraction. Reiterating the finding that the employees provided a service and did not produce an article, the Secretary explained that service workers may be certified for adjustment assistance "only if there is a reduced demand for their services from a parent firm, a firm otherwise related to the subject firm by ownership, or a firm related by control." Although some workers in the parent company, Marathon Oil Company, had been certified as eligible for adjustment assistance, the Secretary stated that the employees' firm, Marathon Ashland Pipe Line, did not serve the facilities where workers had been certified. Finally, the Secretary explained that the investigation had shown that the employees' separations were the result of the sale of firm assets, not the result of a reduction in demand for their services originating at a related company's production facility.

The employees sought judicial review of the Secretary's negative determination by commencing a civil action in the United States Court of International Trade pursuant to 19 U.S.C. § 2395(a). After the employees moved for judgment on the administrative record, the Secretary sought and obtained a voluntary remand to conduct a further investigation into whether the employees had supported crude oil production activities of Marathon Ashland Pipe Line's parent company, Marathon Oil Company. After a further inquiry to Marathon Ashland Pipe Line, the Secretary again denied the petition for adjustment assistance. The Secretary stated that the remand investigation had revealed that during the pertinent period, Marathon Ashland Pipe Line had transported crude oil that Marathon Oil Company and Marathon Ashland Petroleum had purchased from independent Illinois Basin producers, but that Marathon Ashland Pipe Line had not transported crude oil extracted by the par-

ent company, Marathon Oil Company. For that reason, the Secretary concluded that the employees had not supported crude oil production of the parent company, Marathon Oil Company.

The employees then renewed their statutory review action before the Court of International Trade. After further briefing, the court ruled that the Secretary's decision was not supported by substantial evidence. *Former Employees of Marathon Ashland Pipeline, LLC v. Chao*, 215 F.Supp.2d 1345 (Ct. Int'l Trade 2002). The court determined that the Secretary had not conducted a reasonable inquiry because "the administrative record provides limited information discussing whether the Plaintiffs' duties as gaugers place them within the group of eligible import-impacted employees Congress intended to benefit" from adjustment assistance and that the Secretary "fail[ed] to offer any explanation of the analysis used to determine that Plaintiffs' work as gaugers did not constitute 'producing' an article within the meaning of Section 2272." The court also determined that it was improper for the Secretary to rely entirely on representations by Marathon Ashland Pipe Line because "evidence presented by the petitioning workers stating that they were involved in more than the mere transportation of crude oil, directly contradicts the company officials' conclusions." The court further concluded that "[b]y failing to give a reasoned analysis for its determination that the gaugers did not participate in production, Labor neglected its duty to interpret the meaning of 'production' under Section 2272."

Even assuming that the employees were service rather than production workers, the court ruled that the Secretary failed to investigate whether they were qualified for adjustment assistance on the ground that there was a "causal nexus" between increased imports and the loss of their jobs. Finally, the court determined that the Secretary "ignored the issue of whether Marathon Oil's decisions to purchase crude oil imported from Mexico and Canada resulted in the sale of company assets."

The court remanded the matter to the Secretary "for further examination into whether the petitioning employees 'produce' an 'article' within the meaning of the Act, and whether a causal nexus exists between service provided by Marathon Ashland Pipe Line, LLC and production of an import-impacted article by Marathon Oil." The court also directed that "[i]n order to fulfill its duty to conduct an investigation with the utmost regard for the petitioning workers, Labor should conduct a thorough investigation to fully assess both [Marathon Ashland Pipe Line's human resources representative's] information and Plaintiffs' claims."

On remand, the Secretary sought further information from Marathon Ashland Pipe Line about the firm's business and the former employees' duties. Based on the reply, the Secretary again determined that the employees were not eligible for adjustment assistance. The Secretary found that Marathon Ashland Pipe Line is a common carrier pipeline company that provides a service by transporting crude oil and petroleum products, and that the employees "were primarily responsible for activities related to the transportation of crude oil produced in Southern Illinois/Indiana via Marathon Ashland Pipe Line LLC pipelines." As gaugers, the Secretary found, the employees were responsible for quality control; in particular, it was their responsibility to collect representative samples of the crude oil that had been extracted by the independent producers and stored in tanks at the oil fields, and to test the samples and certify that the crude oil was acceptable for purchase.

After certifying the quality of the crude oil, the gaugers would verify the quantity of the product in the tank and authorize delivery of the crude oil into the Marathon Ashland Pipe Line. According to the Secretary, the gaugers' functions "were related to ensuring that crude oil purchasers received the quality and quantity of crude oil they were purchasing." As such, the Secretary found, the gaugers were not engaged in activities related to the exploration for or production of crude oil.

In addition, based on Marathon Ashland Pipe Line's representations the Secretary determined that the division for which the employees worked was sold as part of an asset sale because it was not of strategic value to the parent company. The Secretary also found that Marathon Ashland Pipe Line was still transporting crude oil obtained from the Illinois Basin producers, but that other companies were gauging the crude oil and transporting it from the well-head to the Marathon Ashland Pipe Line facilities. The Secretary therefore concluded that the employees had lost their jobs because of the asset sale, not because of Marathon's decision to import crude oil.

Finally, the Secretary concluded that because the employees "were engaged in a service," they could not be certified for adjustment assistance "since they were not in direct support of [an adjustment assistance] certified facility during the relevant period." In that regard, the Secretary noted that the refinery that was the destination for much of the crude oil transported by Marathon Ashland Pipe Line was not under an existing adjustment assistance certification during the relevant period.

The Court of International Trade reviewed the Secretary's remand findings and again concluded that the Secretary's negative determination was not supported by substantial evidence. *Former Employees of Marathon Ashland Pipeline, LLC v.*

*Chao,* 277 F.Supp.2d 1298 (Ct. Int'l Trade 2003). The court regarded the question of statutory eligibility for adjustment assistance as turning on whether the gaugers were engaged in "production" or not, a question that the court held the Secretary had not adequately addressed. Upon analysis of the gaugers' responsibilities in the context of the crude oil production process, the court concluded that the gaugers were engaged in the production of crude oil. In reaching that conclusion, the court relied on various sources, including a Department of Labor publication that listed gaugers in the category of "production occupations." In addition, the court concluded that crude oil "does not 'exist' as a 'commodity' until after the gaugers perform their job" because crude oil is not sold or transported until after the gaugers evaluate its quality. Thus, the court ruled that the production of crude oil includes all activities that precede the point at which the crude oil enters the stream of commerce, i.e., all work done "by workers who act prior to the time the oil is transported."

The court then looked to the legislative history of section 2272, and in particular the 1988 amendments to that provision. The court noted that the 1988 amendments were intended to expand the definition of crude oil production to encompass exploration and drilling. In light of the congressional purpose to expand the definition of "production" within the oil industry, the court concluded that the term "production" should be understood to encompass other oil industry employees, such as gaugers.

The court next addressed and rejected the Secretary's conclusion that the importation of crude oil had not caused the employees to lose their jobs. On that issue, the court held that the plaintiffs had alleged that the Robinson, Illinois, refinery had been converted to enable it to refine

foreign oil having a higher sulfur content and that the Secretary had not investigated that allegation or addressed it in any of the negative determinations. For that reason, the court concluded that "no evidence exists in the record to support Labor's conclusion that the gaugers' termination was not the result of a decision by Marathon to import crude oil."

With regard to the proper remedy, the court concluded that "[n]othing in the record indicates that Labor has the resources or willingness to conduct an investigation beyond making inquiries of [Marathon Ashland Pipe Line]." The court accordingly saw "little benefit to be gained by an additional remand." Instead, the court ordered the Secretary, without further proceedings, to certify the employees as eligible for adjustment assistance benefits.

## II

In appealing from the decision of the Court of International Trade directing the Secretary of Labor to certify the employees as eligible for adjustment assistance, the government makes two arguments. First, the government argues that the court improperly overturned the Secretary's finding that the employees provided a service and did not "produce" crude oil.[1] Second, the government argues that the court exceeded its reviewing authority under 19 U.S.C. § 2395 by directing the Secretary to certify the employees for adjustment assistance.

At the time the eight employees of Marathon Ashland Pipe Line lost their jobs, the statute that governed worker eligibility for adjustment assistance provided as follows:

---

**1.** The government has not challenged the portion of the court's ruling rejecting the Secretary's finding that the imports of crude oil did

§ 2272. Group eligibility requirements; agricultural workers; oil and natural gas industry

(a) The Secretary shall certify a group of workers (including workers in any agricultural firm or subdivision of an agricultural firm) as eligible to apply for adjustment assistance under this subchapter if he determines—

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

(b) For purposes of subsection (a)(3)—

(1) The term "contributed importantly" means a cause which is important but not necessarily more important than any other cause.

(2) (A) Any firm, or appropriate subdivision of a firm, that engages in exploration or drilling for oil or natural gas shall be considered to be a firm producing oil or natural gas.

(B) Any firm, or appropriate subdivision of a firm, that engages in exploration or drilling for oil or natural gas, or otherwise produces oil or natural gas, shall be considered to be producing arti-

---

not contribute significantly to the employees' loss of their jobs. We therefore do not address that issue.

cles directly competitive with imports of oil and with imports of natural gas.

19 U.S.C. § 2272 (2000).

Section 2272(a)(3) provides that in order for a worker to be eligible for adjustment assistance, the worker's firm or an appropriate subdivision of that firm must be engaged in the production of articles. In the trial court and on appeal, the parties have addressed that statutory issue by focusing on whether the employees in this case were engaged in work that constituted the "production" of crude oil. The employees argue that if they were engaged in the production of crude oil, their employer was necessarily engaged, at least in part, in the production of crude oil, even though much of the employer's work may not have involved production.

The Secretary determined that the employees in this case were engaged in the transportation of crude oil, not the production of crude oil. The Secretary based that conclusion on her finding that the employees tested oil that had already been produced by independent operators and that the testing was conducted incident to the transportation of the oil to the Robinson, Illinois, refinery or to third-party purchasers. The Court of International Trade, by contrast, concluded that gauging activity in general constitutes a part of the process of producing crude oil, and that the production process for crude oil ends after the crude oil has been extracted and tested, and only when it is transported to purchasers. The court's decision was based on two grounds: first, that the quality control work done by gaugers is an essential part of the process of producing crude oil; and second, that the 1988 amendments to the adjustment assistance statute were intended to broaden the meaning of "production" as applied to the production of crude oil and that the term

accordingly must be extended to include the work performed by gaugers.

We conclude the trial court erred in its approach to the "production" issue. While the definition of the statutory term "production" is a question of law, the question whether particular employees are engaged in "production" within that definition is factual. In the case of crude oil, the parties agree that production includes all the steps incident to extracting the oil from the ground, while transportation of the oil includes all the steps incident to moving the oil to the refinery where it will be converted to finished petroleum products. As is commonly the case with integrated processes, however, the general definitions of production and transportation do not necessarily answer the question whether a particular employee who performs tasks at the interface between the two processes is involved in production or transportation. Instead, in such instances the question whether a particular employee's functions are properly characterized as part of the process of production or part of the process of sale and transportation will necessarily depend on the particular facts of the case, such as how the sale and transportation transactions were arranged and whether the employees were serving as agents of the producer/seller or of the purchaser or transporter.

■ In this case, the Secretary found that the gaugers were employed by the transportation company, which was not affiliated with the producers, and that the gaugers' role was to test the stored crude oil on behalf of the purchasers to determine its quantity and quality. Under those circumstances, it was reasonable for the Secretary to conclude that the gaugers were not involved in the production process but instead were serving as buyers' agents ensuring that the quantity and quality of the produced product were con-

sistent with the terms of the proposed sale.[2]

Contrary to the view of the trial court, the fact that part of the gaugers' responsibility involved quality control does not necessarily render them production workers. Nor should the employees in this case necessarily be considered production workers simply because other gaugers performing similar tasks in other settings would be regarded as part of the production process. If, for example, the independent producers and the pipeline company had both employed gaugers to test the crude oil—the producers using the gaugers to test the oil before the producers placed it on the market and the pipeline company using the gaugers to ensure that the oil that was offered for purchase was of the requisite quality and quantity—it would be reasonable to characterize the first set of gaugers as part of the production process and the second set of gaugers as part of the purchase and transportation process, even though the work they did would be identical. In this case, the Secretary found that the gaugers were performing work that fit within the second category, and the employees have not offered any evidence to the contrary. Indeed, a representative of one of the gaugers proffered that the gauger would determine "whether the crude oil produced was of such a quality as to be purchased by Marathon Oil Company and transported into the pipe line maintained by Marathon Ashland Pipe Line LLC," which is consistent with the Secretary's conclusion that the gaugers were not part of the production process. Thus, we believe the Secretary's conclusion that Marathon Ashland Pipe Line and its gauger employees were not engaged in "producing" crude oil was supported by substantial evidence. *See* 19 U.S.C. § 2395(b) ("findings of fact by the Secretary of Labor . . ., if supported by substantial evidence, shall be conclusive").

With respect to the court's second ground of decision, we do not believe that the 1988 amendments to the adjustment assistance statute require that the gaugers' work be regarded as part of the production process. The 1988 amendments added a new subsection to section 2272 that was directed at the oil and gas industry. The new subsection stated that any firm or subdivision that engages in exploration or drilling for oil or natural gas "shall be considered to be a firm producing oil or natural gas," 19 U.S.C. § 2272(b)(2)(A) (2000), and that any firm

---

**2.** The government argues that we should defer to the Secretary's position in this case pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* deference, however, is applicable only when it appears "that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Where that standard is not satisfied, only the lesser deference accorded under *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), is applicable. *See Mead*, 533 U.S. at 234–35, 121 S.Ct. 2164. As an initial matter, the government has not addressed the criteria for applying full *Chevron* deference and whether the application of those criteria suggest giving *Chevron* deference to the Secretary's investigative determinations. Moreover, it is not entirely clear what it is that the government wishes us to defer to. The Secretary did not explicitly construe the term "production" in the adjustment assistance statute, but instead merely concluded that the plaintiff employees, and thus their firm, were not involved in the production of crude oil. In any event, regardless of whether it is appropriate to accord *Chevron* or *Skidmore* deference to an unarticulated, implicit construction of the term "production," that issue has no effect on the disposition of this case, because we would reach the same result in this case with or without deference.

or subdivision that engages in exploration or drilling for oil or natural gas, "or otherwise produces oil or natural gas, shall be considered to be producing articles directly competitive with imports of oil and with imports of natural gas," *id.* § 2272(b)(2)(B). The trial court concluded that the 1988 amendments were intended "to enlarge a restricted interpretation of what it means to produce oil," and that Congress intended for employees such as the gaugers in this case to be eligible for adjustment assistance benefits.

We disagree with the court's conclusion that the 1988 amendments indicate that Congress intended to extend the definition of "production" in the context of the crude oil and natural gas industry to include activities such as gauging. In fact, we draw the opposite inference.

Section 1421 of the Omnibus Trade and Competitiveness Act of 1988 amended section 2272, *inter alia,* by adding subsection (b):

(b) For purposes of subsection (a)(3)—

. . . .

(2) (A) Any firm, or appropriate subdivision of a firm, that engages in exploration or drilling for oil or natural gas shall be considered to be a firm producing oil or natural gas.

(B) Any firm, or appropriate subdivision of a firm, that engages in exploration or drilling for oil or natural gas, or otherwise produces oil or natural gas, shall be considered to be producing articles directly competitive with imports of oil and with imports of natural gas.

Pub.L. No. 100–418, 102 Stat. 1107, 1242–44 (1988). The amendment broadened section 2272 to cover workers in firms that engage in the exploration or drilling for oil or natural gas. Significantly, however, the amendment did not cover all services ancillary to the production process generally.

Thus, there is no indication that Congress sought to include work such as gauging, which takes place after exploration and drilling have concluded and the crude oil has been extracted.

The trial court concluded that the legislative history evidenced an intent by Congress to read "production" expansively, and that, in the spirit of the legislative history, gaugers should fit into the definition. However, the legislative history shows that the 1988 amendments were intended only to effect a limited expansion of the definition of production. The House Conference Report explains that a Senate amendment would have expanded eligibility to all workers and firms in the oil and natural gas industry, including workers and firms who supply essential services to firms in the industry. H.R. Conf. Rep. No. 100–576, at 694 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1727. The conference agreement, however, replaced that proposed amendment with a substitute amendment extending eligibility only to workers and firms engaged in exploration and drilling. *Id.* The Conference Report explained that the purpose of the amendment was to address a discrepancy in the law, whereby "workers employed by [firms engaged only in the exploration and/or drilling for crude oil and natural gas] have been denied program benefits" while "workers engaged in exploration or drilling for firms that also produce crude oil or natural gas are considered as eligible to apply for such benefits." *Id.* The Conference Report also gave examples of what the conferees regarded as firms that are engaged in the exploration or drilling of oil: "For the purposes of this amendment, the conferees consider firms engaged in exploration or drilling to include, for example, independent drillers, pumpers, seismic and geophysical crews, geological crews, and mud companies." *Id.* Thus, the rejec-

tion of a broader amendment that would have covered employees such as gaugers in favor of a narrower amendment covering only workers involved in exploration and drilling is strong evidence that Congress did not intend to broaden the definition of the term "production" beyond the particular activities referred to in the amendment.

Another section of the 1988 Act provides further support for the Secretary's conclusion that the statutory term "production" should not be read broadly to encompass work consisting of providing essential goods and services for the production of articles. Section 1421(b)(1) of the 1988 Act extended adjustment assistance not only to workers in firms that produce goods that compete with imported goods, but also to workers in any firm that "provides essential goods or essential services" for the production of such goods. Pub.L. No. 100–418, § 1421(b)(1), 102 Stat. 1243–44. Although that section of the Act might well have covered the employees in this case, it never became effective because the statute provided that section 1421(b)(1) would become effective only after a certain additional import fee went into effect, *see id.* § 1430(d), 102 Stat. 1257. That fee, in turn, never went into effect because Congress made its effectiveness subject to Presidential rejection, *see id.* § 1430(b), 102 Stat. 1256, and the President declined to make the fee effective, *see Presidential Determination No. 90–34 of August 23, 1990,* 55 Fed.Reg. 34,889 (Aug. 24, 1990). To interpret the term "production" to include work consisting of the provision of services that are essential to the production of articles, but do not constitute the actual production of articles, would in ef-

fect be to treat the "essential goods and services" provision of the 1988 Act as if it had become law, when in fact it did not.

The reasoning of the court in *Former Employees of Permian Corp. v. United States,* 718 F.Supp. 1549 (Ct. Int'l Trade 1989), is instructive on this point. In *Permian,* the petitioners were former employees of a company that transported and sold domestic crude oil. *Id.* at 1550. Relying on the legislative history of the 1988 amendments, the *Permian* court ruled that transportation of crude oil was not part of the production of crude oil. *Id.* Rather, the court stated that "the legislative history of this amendment indicates that it is intended to apply to a distinct category of workers, namely those working for companies involved in locating and extracting oil from the ground, and not more generally to any workers in related industries who may have been adversely affected in some way by oil imports." *Id.* at 1551.

In sum, we do not agree with the trial court that the Secretary committed legal error in defining the statutory term "production" and applying that term to the facts of this case. Based on the evidence in the administrative record, we agree with the government that there was substantial evidence to support the Secretary's fact-intensive determination that the plaintiff employees, who worked for a transportation company and who tested crude oil produced by independent producers incident to its sale and transportation, were not engaged in "production" within the meaning of the adjustment assistance statute, and that their firm therefore did not "produce" crude oil.[3]

---

**3.** The trial court adverted to, but did not decide, the question whether the industry at issue should be characterized as producing refined petroleum products rather than crude oil, in which case the plaintiff employees would be engaged in a single production pro-

cess beginning with exploration and ending with the refining process. The employees cannot prevail on that ground, however, because the adjustment assistance statute requires that the loss of the workers' jobs be attributable to "increases of imports of arti-

## III

The employees make the additional argument that the Secretary did not conduct an adequate investigation in this case, a conclusion with which the trial court concurred. The trial court acknowledged that "unverified statements from company officials in a position to know about the company's products and business decisions can be relied upon when there is no other evidence in the record to contradict or cast doubt upon those statements." In this case, however, the court held that "evidence presented by the petitioning workers stating that they were involved in more than the mere transportation of crude oil, directly contradicts the company officials' conclusions." *Former Employees of Marathon Ashland Pipeline, LLC v. Chao*, 215 F.Supp.2d at 1352–53 (citations omitted); *accord Former Employees of Marathon Ashland Pipeline, LLC v. Chao*, 277 F.Supp.2d at 1311–12.

 The Secretary is entitled to base an adjustment assistance eligibility determination on statements from company officials if the Secretary reasonably concludes that those statements are creditworthy and are not contradicted by other evidence. *See Former Employees of Barry Callebaut v. Chao*, 357 F.3d 1377, 1383 (Fed.Cir.2004). The Secretary based her findings in this case on statements from Marathon Ashland Pipe Line to the effect that Marathon Ashland Pipe Line was engaged in the transportation of crude oil rather than its production, and that the employees performed their quality control functions after the crude oil was extracted but before it was shipped. Although the employees contend that they were involved in the production of crude oil and made that argument in their submissions at the administrative stage of the case, they have not pointed to any evidence that contradicts the factual characterizations of their role in the process, as set forth in the statements by representatives of Marathon Ashland Pipe Line. Instead, they argue generally that quality control performed by gaugers is a production function, and that quality control is necessary and essential to the production of crude oil. As we explained above, the Secretary was entitled to find that the production of crude oil does not include the quality control function performed by the gaugers in this case. Therefore, the statements from Marathon Ashland Pipe Line that it is engaged in the transportation of oil, and that the gaugers perform a quality control function on the oil before it is transported constituted substantial evidence on which the Secretary was entitled to base her determination that the employees were ineligible for adjustment assistance benefits. There was no conflict over the underlying facts in the evidence before the Secretary that precluded the Secretary from relying on the representations by the employer or required that the Secretary take further investigative steps before making her certification decision.

## IV

As we noted above, the government argues that even if the trial court was correct that substantial evidence did not support the Secretary's determination, the remedy ordered by the court—a direction to the Secretary to certify the employees for benefits—was beyond the court's statutory authority. According to the government, 19 U.S.C. § 2395(b) authorizes the Court of International Trade to remand an

cles like or directly competitive with articles produced by such workers' firm," 19 U.S.C. § 2272(a)(3) (2000), and the imports at issue in this case were imports of crude oil, not imports of refined petroleum products.

adjustment assistance case to the Secretary to take further evidence, but it does not authorize the court to direct the Secretary to certify the plaintiff employees as eligible for adjustment assistance. The government also points to another statute, 28 U.S.C. § 2643(c)(2), which provides that the Court of International Trade "may not grant an injunction or issue a writ of mandamus in any civil action commenced to review any final determination of the Secretary of Labor" in an adjustment assistance case. According to the government, that statute prohibits the court from directing the Secretary to certify employees for adjustment assistance. Because we reverse the trial court's ruling that the Secretary's negative determination is not supported by substantial evidence, we have no occasion to address the government's argument that the remedy ordered by the trial court was outside the authority granted to the court under 19 U.S.C. § 2395 and contrary to the restriction on the court's authority found in 28 U.S.C. § 2643(c)(2). *See Former Employees of Barry Callebaut*, 357 F.3d at 1383.

Each party shall bear its own costs for this appeal.

*REVERSED.*