06-32

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
|---|---|---|
| FORMER EMPLOYEES OF GATEWAY COUNTRY STORES LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Before: MUSGRAVE, Judge** |
| | : | Court No. 04-00588 |
| ELAINE L. CHAO, UNITED STATES SECRETARY OF LABOR, | : | |
| | : | |
| Defendant. | : | |
| | : | |

[Labor's determinations on voluntary remand that plaintiffs were not separated from their employment either due to their jobs shifting overseas or due to parent company shifting its domestic production overseas are supported by substantial evidence and otherwise in accordance with law; case dismissed]

Decided: March 3, 2006

Law Firm of Herrick Nikas LLP (*Peter S. Herrick*) for the plaintiffs.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, *Patricia M. McCarthy*, Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch (*Stephen C. Tosini*); of counsel, Office of the Solicitor, United States Department of Labor (*Peter Nessen*) for the defendant.

## OPINION

This action is before the court after a voluntary remand to the United States Department of Labor ("Labor" or "Department"). For the following reasons the Court finds that Labor's remand determination is supported by substantial evidence and otherwise in accordance with law and dismisses this action. The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1581(d)(1) (2000).

*Background*

Plaintiffs are former employees of the Gateway Country Store that was located in Whitehall Pennsylvania (the "Whitehall Location"). After separation from their employment in April 2004, plaintiffs petitioned Labor for certification of eligibility to apply for Trade Adjustment Assistance ("TAA") benefits. *See* Pet. for Trade Adjustment Assistance of 7/28/04 ("Petition"), Application for Recons., Attach.[1] In the Petition plaintiffs responded to a question asking for the "[p]roducts produced by [the] affected group" by stating they had performed "customer service, retail sales, and training." *Id*. at 1. Plaintiffs further averred that they were "secondarily affected" workers because they lost their jobs due to the closure of Gateway's manufacturing operations in the United States. *See id*. In response to questions regarding their being "secondarily affected" workers plaintiffs stated that they neither supplied "components/unfinished or semifinished goods to the TAA certified company" nor "[a]ssemble[d]/finish[ished] products made by the TAA certified company." *See id*.

After review of the Petition, Labor denied plaintiffs' request for certification. *See* Notice of Determinations Regarding Eligibility To Apply for Worker Adjustment Assistance, 69 Fed. Reg. 51,714 (Dep't Labor Aug. 20, 2004). Labor determined that plaintiffs did not meet the eligibility requirements because they "[did] not produce an article as required for certification under section 222 of the Trade Act of 1974." *Id*. at 51,715. In a letter sent to plaintiffs Labor explained that they could not be certified because they were "engaged in retail sales of computers and providing technical support to buyers." Letter from Labor of 8/5/04, Compl., Attach. at 1. Labor further explained that plaintiffs were not eligible to be certified for TAA benefits because

---

[1]      Plaintiffs filed these documents in support of their complaint.

> the worker group . . . must work for a "firm" or appropriate subdivision that produces an article domestically and there must be a relationship between the workers' work and the article produced by the workers' firm or appropriate subdivision. The investigation revealed that although production of an article(s) occurred within the parent firm or appropriate subdivision, the retail sales and technical support workers described above do not support production. Thus, the worker group cannot be considered import impacted or affected by a shift in production of an article.

*Id*. at 1–2.

Plaintiffs then timely requested administrative reconsideration of Labor's determination and submitted additional information in support of their claim. Plaintiffs alleged that they should be certified for TAA benefits because

> in order to meet a customers [2] needs, a computer must first have the correct hardware components, operating system software that will support their environment, and additional software to perform the tasks that a client requires for the home, office, or educational institution. These finished products were both ordered online, over the phone or at the store and assembled at our various manufacturing facilities before being sent to the customer. This *was not* the only location for assembly of technology fit to meet a customers needs. Products *were also* assembled by sales and service staff at the Country Store locations prior to customer purchase. Floppy drives, network cards, graphics cards, hard drives, media drives, tuner cards, and additional input devices were installed as customers could not use a computer to fit their needs without such items. Operating systems needed for business and college systems were installed by the staff at the Whitehall location. Additional software and drivers were also installed by the staff on location to meet a customers needs.

Application for Recons. at 2.

After reviewing the information submitted by plaintiffs, Labor determined that reconsideration was not warranted as plaintiffs' "application contained no new substantial information which would bear importantly on the Department's determination." *See* Gateway Country Store, Whitehall Mall, Whitehall, PA; Dismissal of Application for Recons., 69 Fed. Reg.

---

[2]     Text of plaintiffs' submissions are transcribed verbatim herein with minor alterations to improve clarity.

57,091, 57,091 (Dep't Labor Sept. 23, 2004). In a letter sent to plaintiffs, Labor explained that

> [t]he workers of [the Whitehall Location] were engaged in the sale and service of computers. While the workers did engage in install, repair, and upgrade work, the work performed was on a customer by customer basis and the computers were actually manufactured elsewhere. As such, the work performed at the subject location is considered [a] service and not production or in support of production.

Letter from Labor of 9/16/04, Compl, Attach. at 2.

Plaintiffs then timely commenced this action on November 18, 2004. By their complaint plaintiffs alleged that they should be certified as eligible for TAA benefits because they lost their jobs due to an increase in imports and, in addition, that they were involved in production. *See* complaint at 1–2. Specifically, plaintiffs alleged that Labor "wrongly interprets the commerce of the retail operation as separated from the actual product, and that no product was produced, assembled or serviced at the Whitehall location, in turn falsely concluding that our work was unrelated to or did not support production. . . ." *Id.*, at 1. Plaintiffs explained that

> the retail salesperson for Gateway was in effect both the last guy on the assembly line and also the first part of the actual product. The retail experience and availability from follow-up and tech support was an integral part of the domestic manufacturing strategy for Gateway.
>
> The local retail presence and support service of Gateway Country Stores was not just a branding strategy for Gateway, but very much in itself part of a "holistic package" Gateway was selling. The retail operations cannot be reduced to only a purchase experience enhancement, but were to be recognized as an intrinsic service, bundled and inseparable from the Gateway computer which the TAA previously has recognized as an "article."

*Id.*[3] After reviewing plaintiffs' allegations, defendant requested a voluntary remand so that Labor could "further investigate whether retail sales and technical support personnel were involved in the

---

[3]     After filing their complaint plaintiffs requested, and were assigned, court-appointed counsel. *See* Motion for Leave to Proceed *In Forma Pauperis* of 12/1/04.

'support of production.'" Def.'s Mem. in Supp. of Consent Mot. for Voluntary Remand at 1.

Labor, during the course of its remand investigation, requested additional information from plaintiffs. In a letter dated January 31, 2005, plaintiffs responded to Labor's questions about whether they "completed production or directly supported production" of any articles at the Whitehall Location. *See* letter to Labor of 1/31/05, Pub. R. at 42. In their response, plaintiffs stated that

> [p]ersonnel at the Whitehall location were involved in the rework, upgrade, and final assembly of the *pc solution*. Hardware sales with no solution accounted for a very small percentage of total sales. Most sales were customized special orders with some piece of extra software, hardware, peripherals, or additional component as part of the solution. These new photo solutions, digital audio solutions, home office solutions, gaming solutions, digital video solution[s], or home theater pc solutions were often installed in the service center, or put together by a solutions representative. Even if a solution was sold over the phone, quite often [customers] were instructed to go to the store to have their solution installed/assembled.

Letter to Labor of 1/31/05, Attach. at 2, Pub. R. at 45. After reviewing this response Labor requested clarification of plaintiffs' allegations that they "were involved in the rework, upgrade, and final assembly of the *pc solution*," and what exactly constituted "final assembly" of products. *See* email from Labor of 2/16/05, Pub. R. at 84 (quoting letter to Labor of 1/31/05. Attach at 2, Pub. R. at 45) (emphasis in original). In response, plaintiffs presented further detail about their work at the Whitehall Location. Plaintiffs stated that "the PC SOLUTION approach bears elements that are supportive of the claim that the retail employees completed the final products assembly in-store, to custom requirements." Letter to Labor of 2/22/05, Attach. at 1, Pub. R. at 87. Plaintiffs explained that

> PC SOLUTION is the term used by Gateway representing the sales strategy of the company putting focus on the actual work completed by the employees and the value given to the sale presented to a client. Responsibilities included much more than the sale of goods and services at the Whitehall location, but in fact included many

interactions before, during, and after the sale. This was in fact a distinct advantage in the computer industry Gateway offered by having a domestic presence. This domestic strategy was packaged and marketed to customers in order to compensate for a handicap Gateway possessed by manufacturing and assembling their pc's in the US.

The *pc solution* is the Gateway Advantage for a customer seeking technology needs, both the 'personal computer' and the 'accessories' needed to make that pc do what the customer required. 97% of pc sales at the Whitehall location were customized solutions to meet each individuals needs. Only a very small percentage of clients came to the location to purchase box products without discussing a solution with a sales representative or a technician.

The *pc solution* is the very cornerstone of Gateway's Sales Presentation. The very first step of any customer interaction is to first identify to the customer why choosing Gateway is going to be the best possible experience, an experience they will not get from any other computer retailer. The idea was to point out why Gateway offered such a value to its customers. This way, when the *pc solution* was presented, it was almost impossible to compare Gateway with its competition, because no one else offered the same 'package'. Since no one else offered the same 'package', it is also impossible to compare Gateway on price alone. This was how Gateway distinguished itself from its competition. We were at a price disadvantage, but now we could offer a customer a sales consultant, onsite support, a point of contact for post-sale advice and support, instant sale items without waiting for shipping, and a place to return or exchange items. . . .

A computer does not magically complete everything a customer needs right out of the box. Some customers purchase it for games requiring specific graphic cards, special software, gaming accessories, and of course the games. Some clients required business components, office software, virus and firewall software, networking components, financial software, etc. Some clients required older technology such as floppy drives which were not standard on our pc. A few clients required specific 'training' on what a computer does, how to turn it on, and parental controls, all of which [were] taught at the location in Whitehall. There are countless reasons why a customer needed a pc and limitless different solutions that were created for clients at the location.

*Id.* at 87–88. Plaintiffs further explained what they meant by their allegation that they were involved

in "final assembly" of products:

Final assembly was not just a rarity when creating a pc solution, but rather happened

on virtually every sale. It may have been done physically by a technician or the sales representative or as part of the sales process by the sales representative. *Final assembly represents the idea that many components are collected and put together in such a way as to create a finished product for sale.* Every sale consisted of identifying the clients needs, gathering the components, software or hardware or training, putting them together in such a way that the final solution sold to a customer was a finished product that completed all of the requirements initially stated by the customer. A customer could go into any retail location and purchase a computer, but that 'package' may not do what the customer needs. It might turn on, or perform the functions of a basic computer, but it won't complete the business tasks, or have a specific graphic card to run a game that the client wants. A client can then go out [and] purchase these required accessories, but they may not work with a specific motherboard the client just purchased or it may not have enough memory to handle the complicated nature of video editing. A computer is very complex and all of the components from the hard drive to the memory to even the number of PCI slots need to be evaluated in order to complete the solution for a customer. Even if all of the hardware and the software is collected correctly, the customer may still not know how to install these components or how to complete these tasks or how to fix a problem should one arise. All of these things were solved in the final package assembled by the Gateway representative and sold as a *final pc solution* to the customer.

*Id*. at 88–89. Finally, plaintiffs identified which workers had the primary responsibility for which tasks at the Whitehall Location:

[The Whitehall Location] team worked together to present an overall customer experience bundled into each sale and delivered as a value to each customer. A sales representative not only created a pc solution and completed the sale, but also provided after the sale consultation and demonstration. The sales rep might also help his clients work through problems they were having with their new solution or provide advice on how to complete tasks. Part of the sale also included onsite support and training (completed at the Whitehall location), which may be completed by any one of the other employees of the location, but all of which was part of the overall Gateway Sales Experience and explained to the customer at the time of sale . . . .

Rework, upgrade, and final assembly were *97%* of all *solutions* completed by sales representatives and technicians in the sales process in order to provide a finished product for sale. Solution sales were about 66% of the time spent by sales representatives followed 33% after the sale support/trouble-shooting and product demonstration. The technicians completed more of the hardware support and

customer service as part of the *solution* which was sold by the sales representative. They would also provide upgrades and installation support, *before, during and after* the *solution* was sold to a customer. You can not split these tasks up by percentage when all customers required some portion of the equation in order to create a final product sold as the '*pc solution*'.

*Id*. at 89.

Labor filed the results of its remand investigation on June 20, 2005. *See* Gateway Country Store, Whitehall Mall, Whitehall PA; Notice of Negative Determination on Remand ("Negative Determination"), 70 Fed. Reg. 37,114 (Dep't Labor June 28, 2005); Pub. R. at 107. In the Negative Determination Labor again found that plaintiffs did not meet the eligibility requirements for certification. *Id*., 70 Fed. Reg. at 37,115; Pub. R. at 112. Specifically, Labor determined that, pursuant to 19 U.S.C. § 2272(a)(2)(B), plaintiffs had not manufactured an article within the meaning of the statute and that their jobs had not been shifted overseas. *See id.*, 70 Fed. Reg. at 37,114–15; Pub. R. at 111. Labor also determined that plaintiffs were not eligible to be certified for TAA benefits pursuant to 19 U.S.C. § 2272(a)(2)(A) as plaintiffs did not lose their jobs due to Gateway shifting its domestic production to a foreign country. *See id.*, 70 Fed. Reg. at 37,115; Pub. R. at 111.

### *Standard of Review*

The Court will not find Labor's determinations to be proper unless they are supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 2395(b) (2000); *Former Employees of Stanley Smith, Inc. v. United States Sec'y of Labor*, 20 CIT 201, 203, 967 F. Supp. 512, 515 (1996). As stated by the Court of Appeals for the Federal Circuit:

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Although substantial evidence must be more than

a "mere scintilla," it is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

*Former Employees of Barry Callebaut v. Chao*, 357 F.3d 1377, 1380–81 (Fed. Cir. 2004) ("*Barry Callebaut*"). This Court reviews whether Labor's determinations are "in accordance with law" pursuant to the standard set out in the Administrative Procedure Act. *See Former Employees of Elec. Data Sys. Corp. v. United States Sec'y of Labor*, 28 CIT __, __, 350 F. Supp. 2d 1282, 1286 (2004) ("*EDS*") (*citing* 5 U.S.C. § 706; *Former Employees of Rohm & Haas Co. v. Chao*, 27 CIT __, __, 246 F. Supp. 2d 1339, 1346 (2003); *Woodrum v. Donovan*, 5 CIT 191, 193, 564 F. Supp. 826, 828 (1983); *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496–97 (2004)).

## *Discussion*

I.      Labor's Determination Pursuant to 19 U.S.C. § 2272(a)(2)(B)[4]

Section 222 of the Trade Act of 1974, *as amended*, 19 U.S.C. § 2272 (2002), provides, in relevant part:

(a) In general. A group of workers . . . shall be certified by the Secretary as eligible to apply for adjustment assistance under this chapter pursuant to a petition filed under section 221 if the Secretary determines that--

(1)   a significant number or proportion of the workers in such workers' firm, or an appropriate subdivision of the firm, have become totally or partially separated, or are threatened to become totally or partially separated; and

(2) . . . (B)      (i) there has been a shift in production by such workers' firm or subdivision to a foreign country of articles like or directly competitive

---

[4]      The Court addresses the parties' arguments in the order in which they are presented in their papers.

with articles which are produced by such firm
or subdivision . . . .

To be certified as eligible for TAA benefits pursuant to section 2272(a)(2)(B) workers must produce

an "article." As stated by this Court, "[w]hile the definition of the statutory term 'article' is a

question of law, the question of whether particular items produced by Plaintiffs would fall into this

definition is factual." *EDS*, 28 CIT at __, 350 F. Supp. 2d at 1291 (citing *Former Employees of*

*Marathon Ashland Pipeline, LLC v. Chao, Sec'y of Labor*, 370 F.3d 1375, 1381 (Fed. Cir. 2004)

("*Marathon*")); *Former Employees of Merrill Corp. v. United States*, 29 CIT __, __, 387 F. Supp.

2d 1336, 1342 (2005) ("*Merrill*") (citing *EDS*, 28 CIT at __, 350 F. Supp. 2d at 1291). While the

term "article" is not defined by statute, the meaning of that term has been reviewed extensively by

this Court. *See e.g.*, *Merrill*, 29 CIT at __, 387 F. Supp. 2d at 1342–43 (presenting overview of the

Court's examination of the term article). Workers can be certified for TAA benefits where they

produce a tangible commodity. *Nagy v. Donovan*, 6 CIT 141, 145, 571 F. Supp. 1261, 1264 (1983).

Workers may also produce an article where an existing commodity is transformed into something

new. *Pemberton v. Marshall*, 639 F.2d 798, 800 (D.C. Cir. 1981) ("*Pemberton*"); *Former*

*Employees of Shaw Pipe, Inc. v. United States Sec'y of Labor*, 21 CIT 1282, 1287, 988 F. Supp. 588,

592–93 (1997). Finally, in order to be eligible for certification, workers must satisfy every element

of the statute. *See Merrill*, 29 CIT at __, 387 F. Supp. at 1342 (citing *Shaw*, 21 CIT at 1285, 988 F.

Supp. at 591).

        In the Negative Determination Labor found that plaintiffs did not produce an article within

the meaning of the statute. Labor stated that:

        [T]he Gateway Country Stores ("Stores") operated as a showroom and retail outlet

for Gateway computers and related products, such as monitors, and as a service shop. The Stores, which opened in the United States during the late 1990s, operated on the basis of a European marketing strategy.

Customers would enter the Store and view/test-try the floor models. Customers could purchase prepackaged computers ("cash and carry") or place an order with the Store's personnel. Prepackaged computers were shipped from an off-site manufacturing plant to a Store's inventory room, then sold "as is" to the customer. Aside from the display models, the prepackaged computers were not removed from their boxes by Store personnel. Orders placed by the customer are assembled and packaged by off-site Gateway manufacturing plants, then shipped directly from the plant to the customer's mailing address. Customers who sought service or repair for their units brought them to the Stores after receiving it at the pre-selected mailing addresses. . . .

According to Gateway company officials, workers at the subject facility did not install programs or devices unless it was post-sale and the customer brought the unit into a Store for service. Further, a careful review of the position descriptions of the workers at the subject facility show that the workers were not engaged in production work but performed sales and marketing, sales/product training, store opening/closing, human resources, budgeting, customer service, inventory control, and management functions.

The Department has consistently held that the performance of installation, repair and customer service is not production for the purposes of the Trade Act. Thus, the Department determines that petitioners do not produce and article within the meaning of the Trade Act of 1974.

Negative Determination, 70 Fed. Reg. at 37,114, Pub. R. at 109–110 (citations omitted).

As a preliminary matter, the record supports Labor's determination that plaintiffs were almost entirely involved in sales or other activities not related to the physical assembly of computers. Evidence supporting this determination includes the following: first, in their initial petition for benefits plaintiffs indicated that they were involved in "customer service, retail sales, and training" (Petition at 1); second, all of the job descriptions submitted to Labor by Gateway indicate that plaintiffs' jobs involved either sales, management, training, or other store operations not related to

physically working on computers (*see* Conf. R. at 11–41); third, training documents submitted by plaintiffs in response to Labor's requests for information are all related to sales  (*see* Pub. R. at 46–63); finally, plaintiffs themselves state that nearly all of their work at the Whitehall Location involved sales or other activities not related to assembly (*see* Pub. R. at 89 ("Solution sales were about 66% of the time spent by sales representatives followed [by] 33% after the sale support/trouble-shooting and product demonstration.")).

The record also supports Labor's determination that the computers assembled at Gateway's domestic manufacturing facilities were always fully-functional units that could be used without further modification right out of the box.  Evidence that supports this determination includes: first, in the Application for Reconsideration plaintiffs state that the computers were "finished products [that] were both ordered online, over the phone, or at the store and assembled at our various manufacturing facilities before being sent to the customer" (Application for Recons. at 2 ); second, a Gateway official stated that "[c]omputers were assembled at our various manufacturing locations" (email from Gateway to Labor of 1/25/05, Pub. R. at 8); third, a Gateway official stated that "The Country [S]tores displayed our products.  The customer could place the order at the store [and then] the product, which would be assembled in our manufacturing plant, [was] shipped directly to the customer's home" (email from Gateway to Labor or 2/28/05, Pub. R. at 93).

While the record supports Labor's determinations that plaintiffs were almost entirely involved in sales and that Gateway always shipped fully-functional computers directly from its manufacturing facilities to its customers, plaintiffs nevertheless argue that they created an article within the meaning of the statute because they were part of a "team" that assembled products at the

Whitehall Location. In other words, even though plaintiffs themselves did not create an article, there

were other employees—identified as technicians—who did and, so, plaintiffs should be certified for

TAA benefits.[5] Plaintiffs argue that using the factors outlined in *Pemberton*, Labor should have

determined that the workers at the Whitehall Location produced an article. *See* Pls.' Brief in Supp.

of Their Objection to the Def.'s Remand Results at 4–5 ("Pls.' Mem.") (citing *Pemberton*, 639 F.

2d at 800). Plaintiffs contend that

> Labor states "According to Gateway officials, workers at the subject facility did not install programs or devices unless it was post-sale and the customers brought the unit into a Store." Labor's statement does recognize that a "computer solution" or a "new" computer system was entering the stream of commerce pursuant to the *Pemberton* factors.
>
> The remaining administrative record does not reflect that Labor properly reviewed and addressed the "new" computer system that Plaintiffs were producing in the Whitehall facility. In fact, a majority of the administrative records are those documents provided by the Plaintiffs and correspondence between Gateway and Labor.

*Id.* at 4–5 (referencing Negative Determination, 70 Fed. Reg. at 37,114, Pub. R. at 110). In response,

defendant argues that Labor's determination that plaintiffs did not produce an article is proper.

Defendant argues that:

> under every sales channel available at the Gateways stores, the computers were prepackaged at the factory, and customers took possession of their computers in that exact prepackaged condition. Likewise, although the plaintiffs did install programs and peripherals, Labor confirmed that all such activity took place *post-sale*. Accordingly, this post-sale servicing activity cannot be considered the production of a good.

Def.'s Resp. to Pls.' Brief Concerning the Voluntary Remand Results ("Def.'s Resp.") at 4 (citations

---

[5]     There is no indication or argument that the Whitehall Location employees identified as technicians were either certified for—or even sought certification for—TAA benefits.

omitted; emphasis as in original).

The Court does not agree that Labor's determination is improper. While arguing this Court's decision in *Pemberton* controls this matter, plaintiffs do not explain how that decision compels a result different than that reached by Labor. In *Pemberton* the plaintiffs argued that workers who "remanufactured" ships should be certified as eligible for TAA benefits. The Court rejected that argument stating

> [t]he Act requires the manufacture of an article the demand for which is decreased by the importation of a like article. The legislative history of the Act offers no specific guidance on the interpretation of the term "article," but a reading of the entire statute, its purposes and goals, leaves no doubt that Congress contemplated an equalization of markets for domestic goods. The repair and maintenance of a ship is clearly a service to an existing commodity. Even if the repair necessitates the use of new materials, it cannot be said to be the creation of a new ship any more than overhauling an automobile can be said to be manufacturing a car. Semantics do not overcome the reality that nothing new is entered into the stream of commerce.

*Pemberton*, 639 F.2d at 800 (footnote omitted). Here, plaintiffs seize upon the Court's observation that a group of workers might be certified for TAA benefits where something "new is entered into the stream of commerce" and, in this case, that "something new" would be the fully-functional computers that Gateway manufactured at its domestic production facilities and shipped directly to customers that then had additional hardware, software, or other accessories installed at the Whitehall Location. *See* Pls.' Mem. at 4–5. The Court allows that part of plaintiffs' argument—that Labor may not have fully addressed the issue of whether post-sale work on computers created a new article—may have some merit[6]; on the other hand, plaintiffs do not explain how something

---

[6] The Court notes that Labor, in the Negative Determination, did not follow the two-step analysis set out by this Court for determining whether plaintiffs manufactured an article. *See EDS*, 28 CIT at __, 350 F. Supp. 2d at 1291. Labor did not define the legal term "computer" and

(continued...)

completely new is entered into the stream of commerce—rather than "a service to an existing commodity"—by the installation of standard hardware, off-the-shelf software, or other accessories[7] into an otherwise fully-functioning computer. *Pemberton*, 639 F.2d at 800. Furthermore, plaintiffs do not explain how the introduction of these types of components alter an existing article in such a fundamental manner so that it is transformed into a different article. *Shaw*, 21 CIT at 1287, 988 F. Supp. at 592–93 ("[M]inor alterations to or repairs made on more complex and intricate products are unlikely to result in the alteration or transformation of the underlying product."); letter to Labor of 2/22/05, Attach. at 2, Pub. R. at 88 (stating that "A computer is very complex . . . ."). In any event, even though Labor's determination in this regard is flawed, there remains Labor's further determination that plaintiffs were not separated from their employment at the Whitehall Location due to their jobs being shifted to a foreign country. *See* 19 U.S.C. § 2272(a)(2)(B)(i). In the Negative Determination Labor stated that "those functions which took place in the Whitehall Locations were revised over several years and shifted to other domestic venues. For example, sales and customer service are handled via telephone and the Internet; Gateway products are sold and serviced in national retail outlets." Negative Determination, 70 Fed. Reg. at 37,115, Pub. R. at 111 (citing Conf. R. at 1, 3, 101). Plaintiffs make no argument that this determination is in error and plainly admit that their jobs were not shifted to a foreign country. *See* letter to Labor of 1/31/05,

---

    [6](...continued)
then assess the evidence to determine whether plaintiffs work, as a factual matter, was related to creating that article.

    [7]    Plaintiffs characterize the various components that could be installed into computers at the Whitehall Location as "additional hardware and software" or "accessories." *See* letter to Labor of 1/31/05 at 3, Pub. R. at 44; letter to Labor of 2/22/05 at 3, Pub. R. at 88.

Attach. at 2, Pub. R. at 45 ("[M]anufacturing of the pc's shifted overseas . . . . Gateway Country employees jobs however were not shifted to a foreign country. Instead they were eliminated completely."). Therefore, because plaintiffs' argument, based in part on their contention that they created an article at the Whitehall Location as part of a "team" that assembled computers, does not satisfy all the requirements of 19 U.S.C. § 2272(a)(2)(B), that claim must fail. *Merrill*, 29 CIT at __, 387 F. Supp. 2d at 1342. Therefore, Labor's determination that plaintiffs were not eligible to be certified for TAA benefits pursuant to 19 U.S.C. § 2272(a)(2)(B) is supported by substantial evidence and otherwise in accordance with law.

II.      Plaintiffs' 19 U.S.C. § 2272(a)(2)(A) Argument

Pursuant to section 2272, workers may be certified for TAA benefits where:

(1) a significant number or proportion of the workers in such workers' firm, or an appropriate subdivision of the firm, have become totally or partially separated, or are threatened to become totally or partially separated; and

(2)      (A)      (i) the sales or production, or both, of such firm or
                       subdivision have decreased absolutely;

                (ii) imports of articles like or directly competitive
                with articles produced by such firm or subdivision
                have increased; and

                (iii) the increase in imports described in clause (ii)
                contributed importantly to such workers' separation or
                threat of separation and to the decline in the sales or
                production of such firm or subdivision . . . .

19 U.S.C. § 2722(a)(2)(A).

As part of its remand investigation Labor contacted Gateway and requested information as to whether plaintiffs were separated from their employment due to Gateway shifting its domestic

manufacturing to a foreign country. In response, a Gateway company official stated that Gateway's

decision to close all of the County Stores was based on several factors, the two main of which being

that the stores were unprofitable and that Gateway shifted its sales to other channels. *See* letter to

Labor of 4/20/05, Conf. R. at 101. Based upon this information Labor determined that plaintiffs

were not eligible for certification of TAA benefits pursuant to 19 U.S.C. § 2272(a)(2)(A). Labor

explained that

> Gateway's creation of the Stores was not to distinguish itself from its competitors as
> an effort to secure and/or maintain its market. Rather, the Stores were based on a
> revenue channel that Gateway was already using in Europe and Gateway had hopes
> that its domestic Stores would also be profitable.
>
> Like other companies facing strained economic conditions, Gateway
> undertook a large-scale business plan to change its direction. Information obtained
> from Gateway show[s] that the business plan started several years before the
> investigatory period (July 2003 through July 2004), that the change of revenue
> sources was part of its dynamic business revolution, and that the Store closures were
> but one form of corporate cost-reduction, as was the independent decision to shift
> some manufacturing to foreign countries. The Stores were closed because they were
> unprofitable.

Negative Determination, 70 Fed. Reg. at 37,115, Pub. R. at 111 (citations omitted).

Plaintiffs argue that Labor's determination is not supported by substantial evidence or

otherwise in accordance with law. Plaintiffs state that Labor did not "make a reasonable inquiry into

Gateway's allegations that imports and outside production did not hurt its sales." Pls.' Mem. at 5

(citing *EDS*, 28 CIT at __, 350 F. Supp. 2d at 1291; *Former Employees of Sun Apparel of Tex. v.*

*United States Sec'y of Labor*, 28 CIT __, __, Slip Op. 04-106 at 22–23 (Aug. 20, 2004)). Plaintiffs

argue that they

> requested that Labor inquire as to how Gateway's sales diminished by over 60% in
> three years due to competition from all of the major competitors who had already

switched to an import cost structure and how this drove Gateway to adopt an import based structure just like all of its competition[]. Labor forwarded Plaintiffs' inquiry to Gateway on April 4, 2005. Gateway responded that "The decision by Gateway to close the Stores was not in anyway based on the fact that Gateway moved its computer assembly/production outside the United States." Gateway did not provide any further explanation or reasoning to back its answer. Gateway did not provide any financial documentation to support its answer and conclusions. Labor did not request an explanation to the answer. Labor did not request any financial documentation as to . . . Gateway's reasoning or restructuring at this time.

Pls.' Mem at 5–6 (citations omitted). In other words, plaintiffs are arguing that, without further factual development, it was improper for Labor to rely on the statement "[t]he decision by Gateway to close the Country Stores was not in anyway based on the fact that Gateway moved its computer assembly/production outside the United States."

Defendant responds Labor's determination is proper, that:

[T]here is no evidence upon the record that "increases of imports" of computers "contributed importantly" to the workers' separation. 19 U.S.C. § 2272(a)(2)(A)(iii). Specifically, the record reflected that the employees' dislocation was the result of a business decision by Gateway to close an unprofitable sales channel, with the functions of the stores shifted to other channels. Furthermore, the business plan that resulted in the store closures was begun several years *before* the period of investigation. Indeed, there is simply no evidence upon the record indicating that Gateway closed its stores due to foreign competition.

Plaintiffs' claims here are insufficient. Specifically, plaintiffs merely allege that Labor's reliance upon company representatives' representations was erroneous. However, the appellate court has explained that Labor may rely upon representations of the former employer in TAA cases, where there is no contradictory evidence demonstrating the representations are inaccurate.

Def.'s Resp. at 6 (emphasis in original); *see id*. at 7 (citing *Barry Callebaut*, 357 F.3d at 1383).[8] As

---

[8]        In their papers filed in response to defendant's voluntary remand, the parties focus their argument on subsection (iii) of 19 U.S.C. § 2272(a)(2)(A). As Labor's determination in this regard is supported by substantial evidence and otherwise in accordance with law, the Court does not examine whether Labor's determinations as to subsections (i) or (ii) were proper. *Merrill*, 29 CIT at __, 387 F. Supp. 2d at 1342.

pointed out by defendant, the Court of Appeals for the Federal Circuit has held that Labor "is entitled to base an adjustment assistance eligibility determination on statements from company officials if the Secretary reasonably concludes that those statements are creditworthy and are not contradicted by other evidence." *Marathon*, 370 F.3d at 1385 (citing *Barry Callebaut*, 357 F.3d at 1383). Furthermore, it is reasonable for Labor to rely on information supplied by a company official where that information is not disputed by either party or, if there is a dispute, if Labor conducts an adequate investigation into the reliability of that information. *See Former Emples. of Ericsson, Inc. v. United States Sec'y of Labor*, 28 CIT __, __, Slip Op. 04-130 at 9–10 (Oct. 13, 2004) ("*Ericsson*") (discussing *Marathon*, 370 F. 3d at 1381, *Barry Callebaut*, 357 F.3d at 1383). The Court does not agree that, here, Labor's reliance on the company official's statement was improper because there is no real disagreement as to accuracy of the statement. Specifically, documents filed by plaintiffs in support of their claim in this action buttress the company official's statement by showing that the reason Gateway decided to close all of the Country Stores was due to the stores' high overhead costs and due to the fact that selling products through the Country Stores had the potential to create conflicts with the domestic retail outlets where Gateway planned to sell its products. *See* Application for Recons., Attach., Charles Smulders *et al.*, *Gateway Closes Retail Stores in Push for Greater Profitability*, Gartner.com (April 5, 2004) ("Despite Gateway's success in higher-margin consumer electronics, most of its revenue flows from low-margin PCs. Gateway has been unable to drive enough revenue via its stores to justify their costs."); *Id.*, Richard Shim & John G. Spooner, *Gateway to shutter stores, cut staff*, CNET News.com ("Analysts, who had been theorizing that the

retail outlets were on the chopping block for weeks, said the stores could have been a liability for Gateway's efforts to form relationships with third-party retailers."). As plaintiffs' own documents support the company official's statement, there can be no serious dispute as to its accuracy or that it was reasonable for Labor to rely on it. *Marathon*, 370 F.3d at 1385. Therefore, because Labor's determination that plaintiffs, as salespeople at the Whitehall Location, did not lose their jobs due to Gateway shifting its domestic production to a foreign country is supported by substantial evidence and otherwise in accordance with law, Labor's determination that plaintiffs were not eligible to be certified for TAA benefits pursuant to 19 U.S.C. § 2272(a)(2)(A) is proper.

### *Conclusion*

Because the Court finds Labor's determinations on voluntary remand to be supported by substantial evidence and otherwise in accordance with law, this action is dismissed. Judgment shall enter accordingly.

/s/ R. Kenton Musgrave
R. Kenton Musgrave

Dated:     March 3, 2006
New York, NY