**Slip Op. 08-143**

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____

FORMER EMPLOYEES OF WELEX, INC.,   :

                  *Plaintiffs*,   :

             v.            :         Court No. 07-00314

U. S. SECRETARY OF LABOR,       :

                  *Defendant*.   :

_____

[Revised Determination on Remand, certifying workers as eligible to apply for Trade Adjustment Assistance and Alternative Trade Adjustment Assistance, is sustained.]

Dated:  December 23, 2008

Hogan & Hartson LLP (Craig A. Lewis, Gabriela Carias-Green, and Katherine Dickson), for Plaintiffs.

Gregory G. Katsas, Assistant Attorney General; Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Matthew H. Solomson), counsel, for Defendant.

## OPINION

RIDGWAY, Judge:

In this action, former employees of Blue Bell, Pennsylvania-based Welex, Inc. ("the Workers") successfully contested the determination of the U.S. Department of Labor denying their petition for certification of eligibility for trade adjustment assistance ("TAA") and alternative trade adjustment assistance ("ATAA").  *See* Letter to Court from Hector Cornillot, dated August 16, 2007 ("Complaint"); 72 Fed. Reg. 17,938 (Apr. 10, 2007) (notice of receipt of petition and initiation of investigation); 72 Fed. Reg. 26,423, 26,425 (May 9, 2007) (notice of denial of petition); 72 Fed.

Reg. 39,080 (July 17, 2007) (notice of denial of request for reconsideration); A.R. 17-18, 29-34, 42.[1]

Jurisdiction lies under 28 U.S.C. § 1581(d)(1) (2000).

Now pending before the Court is the Labor Department's Notice of Revised Determination

on Remand ("Remand Determination"), which certifies that:

> All workers of Welex, Inc., Blue Bell, Pennsylvania, who became totally or partially separated from employment on or after March 26, 2006, through two years from the issuance of this revised determination, are eligible to apply for Trade Adjustment Assistance under section 223 of the Trade Act of 1974, and are eligible to apply for alternative trade adjustment assistance under Section 246 of the Trade Act of 1974.

73 Fed. Reg. 39,045, 39,046 (July 8, 2008). *See also* Defendant's Motion to Dismiss; Plaintiffs'

Response to Defendant's Motion to Dismiss and Cross-Motion for Judgment on the Agency Record;

Defendant's Reply in Support of Its Motion to Dismiss and Its Opposition to Plaintiffs' Cross-

Motion for Judgment.[2]

---

[1] The administrative record in this case consists of two parts – the initial Administrative Record (which the Labor Department filed with the court after this action was commenced), and the Supplemental Administrative Record (which was filed after the Labor Department's post-remand certification of the Workers).

The two parts of the administrative record are separately paginated; both parts include confidential business information. Citations to the public record are noted as "A.R. ____" and "S.A.R. ____," as appropriate, while citations to the confidential record are noted as "C.A.R. ____" and "C.S.A.R. ____."

[2] As reflected in the captions of the cited submissions, the parties have filed cross-motions based on the Labor Department's Remand Determination certifying the Workers for TAA/ATAA. The argument advanced by the Government is a novelty, never before raised in the history of TAA litigation in this court. Neither party has explained the real-life, practical ramifications of their dispute (if any). Nor does it appear that either party has focused on the unusual nature of TAA/ATAA cases (which are in certain respects akin to class actions), or on the substantive nature of the underlying legislation (which is remedial). These factors may well implicate unique procedural considerations which the parties' papers do not address.

The Workers have advised that they are satisfied with the Department of Labor's certification. Accordingly, based on a review of the Remand Determination in light of the administrative record as a whole, and with the observations set forth below, the Labor Department's Remand Determination is sustained.

---

In any event, what is clear is that – as counsel for the Workers properly note – historically "this Court's consistent practice when it has remanded a TAA case to the Department of Labor, which has then made the decision to certify, is first to affirm that Labor's certification decision was in accordance with law, and only then to dismiss the case." *See* Plaintiffs' Response/Cross-Motion at 3. It is equally clear that – on occasion – the court's review has identified errors in the Labor Department's remand determination and certification, which have required clarification and/or correction by the agency. (As suggested above, such clarifications and corrections may be particularly important to the extent that TAA/ATAA cases are, in many respects, effectively class actions, determinative of the rights of a class of individuals well beyond the individual representative plaintiffs in litigation.) *See*, *e.g.*, Former Employees of Ameriphone, Inc. v. United States, 27 CIT 1611, 1615 n.4, 288 F. Supp. 2d 1353, 1357 n.4 (2003) (where Labor Department's initial Notice of Revised Determination on Remand erroneously certified petitioning workers as eligible for TAA (rather than NAFTA-TAA), agency issued corrected determination; but corrected determination bore wrong date, and third determination was issued to correct that error); 68 Fed. Reg. 53,399 (Sept. 10, 2003); 68 Fed. Reg. 54,490 (Sept. 17, 2003); 68 Fed. Reg. 60,120 (Oct. 21, 2003); *see also* Letter from the Court to Parties, Former Employees of Ameriphone, Inc. v. United States, No. 03-00243 (C.I.T. Sept. 4, 2003), and related documents: Letter from Counsel for Plaintiffs to the Court (Sept. 19, 2003); Notice of Filing and Defendant's Response to the Court's Letter Dated September 4, 2003 (Sept. 23, 2003); Letter from the Court to Counsel for Defendant (Sept. 29, 2003); Notice of Filing and Defendant's Response to the Court's Letter Dated September 29, 2003 (Oct. 1, 2003).

Finally, and most importantly, it is abundantly clear that neither party contests any aspect of the Labor Department's Remand Determination, or its certification; and that the Remand Determination and the certification are supported by substantial evidence and otherwise in accordance with law. Under the circumstances, it is appropriate simply to sustain the Remand Determination, which would appear to moot both pending motions.

## I. <u>Background</u>

The trade adjustment assistance laws are generally designed to assist workers who have lost their jobs as a result of increased import competition from – or shifts in production to – other countries, by helping those workers "learn the new skills necessary to find productive employment in a changing American economy." <u>Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor</u>, 26 CIT 1272, 1273, 245 F. Supp. 2d 1312, 1317 (2002) ("<u>Chevron I</u>") (*quoting* S. Rep. No. 100-71, at 11 (1987)); *see generally* <u>Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor</u>, 30 CIT ____, ____, 454 F. Supp. 2d 1306, 1307-11 (2006) (detailing the history and policy underpinnings of trade adjustment assistance programs).

Trade adjustment assistance programs entitle eligible workers to receive benefits which may include employment services (such as career counseling, resume-writing and interview skills workshops, and job referral programs), vocational training, job search and relocation allowances, income support payments, and a health insurance coverage tax credit. *See generally* 19 U.S.C. § 2272 *et seq*. (2000 & Supp. II 2002).[3] In addition, older workers may be eligible for a wage insurance benefit, known as alternative trade adjustment assistance ("ATAA").[4]

---

[3]The criteria for TAA certification as "production workers" are codified at 19 U.S.C. § 2272. In brief, in a case such as this, workers are eligible for TAA if the Labor Department finds that there have been significant layoffs (or threats of layoffs) by their employer; that there has been an absolute decline in the sales and/or production of the firm; that there has been an increase in imports of "articles like or directly competitive with" articles produced by the firm; and that the increase in imports "contributed importantly" to both the layoffs (or threatened layoffs) and the decline in sales and/or production. 19 U.S.C. § 2272 (Supp. II 2002); *see generally* <u>BMC</u>, 30 CIT at ____ n.6, 454 F. Supp. 2d at 1310 n.6 (detailing eligibility requirements for various types of workers).

[4]ATAA allows workers aged 50 or older, for whom retraining may not be appropriate, to accept reemployment at a lower wage and receive a wage subsidy. Workers who qualify for ATAA

The trade adjustment assistance laws are remedial legislation and, as such, are to be construed broadly to effectuate their intended purpose. UAW v. Marshall, 584 F.2d 390, 396 (D.C. Cir. 1978) (noting the "general remedial purpose" of TAA statute, and that "remedial statutes are to be liberally construed"). *See also* Fortin v. Marshall, 608 F.2d 525, 526, 529 (1st Cir. 1979) (same); Usery v. Whitin Machine Works, Inc., 554 F.2d 498, 500, 502 (1st Cir. 1977) (emphasizing "remedial" purpose of TAA statute); BMC, 30 CIT at _____ n.9, 454 F. Supp. 2d at 1311 n.9 (collecting additional cases).

Moreover, both "[b]ecause of the *ex parte* nature of the certification process, and the *remedial purpose* of the [TAA] program," the Labor Department is obligated to "conduct [its] investigation with *the utmost regard* for the interest of the petitioning workers." Local 167, Int'l Molders and Allied Workers' Union, AFL-CIO v. Marshall, 643 F.2d 26, 31 (D.C. Cir. 1981) (emphases added); *see also* BMC, 30 CIT at _____, 454 F. Supp. 2d at 1312 (collecting additional cases).

Thus, while the Labor Department is vested with considerable discretion in the conduct of its investigation of trade adjustment assistance claims, "there exists a threshold requirement of reasonable inquiry." Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993); BMC, 30 CIT at _____, 454 F. Supp. 2d at 1312 (and authorities cited there). Courts have not hesitated to set aside agency determinations which are the

---

are eligible to receive 50% of the difference between their new and old wages, up to a maximum of $10,000 over two years. *See generally* GAO Report 04-1012, "Trade Adjustment Assistance: Reforms Have Accelerated Training Enrollment, But Implementation Challenges Remain" (Sept. 2004) at 2, 10.

product of perfunctory investigations. *See id.*, 30 CIT at ____ n.10, 454 F. Supp. 2d at 1312 n.10 (cataloguing numerous opinions criticizing Labor Department's handling of TAA cases).[5]

## II. **The Facts of This Case**

The Workers' former employer, Welex, designs, develops, and manufactures to order plastic extrusion systems, which it sells to the plastics industry for high volume production of plastic packaging, such as fast food drink cups, lids for disposable coffee cups, and clear clamshell boxes. A.R. 3, 16; C.A.R. 20. Welex's customers span more than 70 countries around the globe. A.R. 3, 16.

The three former Welex employees who filed the TAA/ATAA petition here at issue were workers at the company's manufacturing plant in Blue Bell, Pennsylvania, where they produced Welex extrusion systems machinery. However, on January 31, 2007 – after more than 30 years of operation – Welex shuttered the Blue Bell plant and moved all production to a facility in North Carolina, in an effort to increase the efficiency and competitiveness of the company's operations. The three petitioners and more than 40 of their fellow employees were terminated on that date. *See* Complaint; A.R. 1, 3-4, 7; C.A.R. 9, 11. Welex's administrative and managerial headquarters remained in Blue Bell. *See* C.A.R. 11, 20.

---

[5]*See also* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1352-54 (summarizing statistics concerning TAA actions filed with Court of International Trade in recent years, and noting that – at least during four year period analyzed – Labor Department never successfully defended a denial without at least one remand).

A.   The Labor Department's Initial Investigation of the Workers' Petition

In late March 2007, the Workers filed their TAA/ATAA petition with the Labor Department. The petition form required that the Workers execute the petition "[u]nder penalty of law." Language in the signature block section of the petition form sternly cautions workers that "[k]nowingly falsifying any information on this Petition Form is a Federal offense (18 USC § 1001) and a violation of the Trade Act (19 USC § 2316)." *See* A.R. 2 (TAA/ATAA petition form).

In the section of the petition form where they were asked to "[p]rovide the reasons why you believe the worker group is eligible for TAA and ATAA certification," the petitioners explained that Welex had told the Blue Bell employees that the pressures of foreign competition necessitated the company's relocation of its manufacturing operations:

> We were told by the company [that] they could not compete with China and other countries and that's why they left, and closed production in PA. . . . [A] lot of plastics manufacturing we were told has gone overseas for cheaper labor costs. That's why I think we may be eligible for TAA and ATAA.

A.R. 2.   In accordance with the instructions on the petition form, the Workers appended documentation to support their claim.

One news article included with the Workers' petition noted the candid admission by Welex's Vice President/General Manager that the move had been in the works for some time. *See* "The Ripple Effect: Companies Moving for Profit," The [Norristown, Penn.] Times Herald (Jan. ____, 2007) (exact date not available) (included at A.R. 4).   The article quoted the company official saying, "So many of our competitors have moved from the industrial north to the more affordable south.  Many manufacturing businesses have moved down south over the last 20 years, to Arkansas, Tennessee, and the Carolinas.  *Our primary reason for going is to be more competitive*."  *Id.*

(emphasis added). Elsewhere in the article, he was reported to have noted the "many American manufacturers now diverting production to overseas locations," and was quoted emphasizing the impact of foreign competition on the company's decision to relocate:

> It's just sad, but it's the nature of manufacturing now. The pencil on your desk, the chair you're sitting in – all made by Chinese. The number of empty facilities in the south [of the United States] is depressing also, so they're really happy to see another company moving into the Carolinas instead of leaving [the United States entirely].

*Id.*[6]

Upon receipt of the Workers' TAA/ATAA petition, the Labor Department forwarded the agency's standard form employer questionnaire (the "Business Confidential Data Request") to Welex management. In marked contrast to the petition form which must be completed by displaced workers applying for TAA/ATAA certification, there is no requirement that employers completing a Business Confidential Data Request submit it under oath. *Compare* A.R. 2 (signature block of TAA/ATAA petition form) *with* C.A.R. 11-15 (Business Confidential Data Request form).

In response to "check-the-box" "yes" or "no" questions on the Business Confidential Data Request form, Welex's Vice President/General Manager indicated, *inter alia*, that the company's customers had not increased imports. C.A.R. 11. In addition, the company was instructed to report sales data for the two full years immediately preceding the Workers' terminations (*i.e.*, for 2005 and 2006), as well as for "Jan-Feb 2006" and "Jan-Feb 2007." C.A.R. 12. Although the data reported

---

[6]Also appended to the Workers' TAA/ATAA petition was a second news article – published online at PlasticsNews.com/China – in which Welex's President sought to attribute the move to North Carolina to the layout of the Blue Bell plant, downplaying the issue of global competitiveness. *See* "Welex Opening New Plant to Meet Global Demand," PlasticsNews.com/China (Jan. 23, 2007) (included at A.R. 3). He was nevertheless quoted discussing the need for the company to operate "in a cost-effective and timely manner." *Id.*

by the company reflected a significant decline in sales for January-February 2007 compared to January-February 2006, the Vice President/General Manager dismissed the difference, noting on the form: "Welex builds machinery to order. The sales volume cannot be predicted. Sales for the last several years and the next six months seems usual (ups and downs)." C.A.R. 12-13. Although the Business Confidential Data Request form also instructed Welex to report production data for the same periods (*i.e.*, for 2005 and 2006, as well as for "Jan-Feb 2006" and "Jan-Feb 2007"), the company left that section of the form blank. *See* C.A.R. 12; C.S.A.R. 1 (reflecting Labor Department's recognition, on remand, that agency had earlier failed to obtain production data).

In an undated internal agency memorandum documenting the "Findings of the Investigation,"[7] the Labor Department stated that Welex's Vice President/General Manager attributed the relocation of the company's manufacturing operations to North Carolina to the size and layout of the Blue Bell plant – an explanation at least somewhat in tension with statements he had earlier made to the Times Herald, reported in the news article appended to the Workers' TAA/ATAA petition.[8] *Compare* C.A.R. 21 *with* A.R. 4. However, there is no indication in the

---

[7]It is disconcerting that the internal agency memorandum documenting the "Findings of the Investigation" reflects facts which are not documented elsewhere in the record. In other words, there are no notes of phone conversations or copies of e-mail messages or other correspondence to back up some of the agency "findings" on which the denial of the Workers' petition was based.

[8]As noted above, Welex's Vice President/General Manager had not previously attributed the Blue Bell plant closure and the relocation of manufacturing operations to the layout of the Blue Bell plant (and, indeed, had instead emphasized the need to relocate to a low-cost location so as to effectively compete with foreign producers). *See* A.R. 4. However, the explanation that he apparently provided to the Labor Department at a later date essentially adopted the very different "spin" that Welex's President had given the issue. *See* A.R. 3.

record that the agency investigator questioned the company official about the seeming discrepancy in his accounts, or otherwise sought to reconcile the statements.[9]

The internal agency memorandum further stated that Welex's Vice President/General Manager painted a very rosy picture of the company's overall financial situation, attributing the company's dramatic "dip in sales for January-February 2007" (compared to January-February 2006) to the relocation of manufacturing operations during the period in 2007. *See* C.A.R. 21. Although the relocation no doubt would have affected *production*, it certainly does not follow as night to day that relocation would have affected *sales* (particularly since the administrative and managerial operations remained at the company's facility in Pennsylvania) – and the figures at issue were sales data. Nevertheless, again there is no indication in the record that the agency investigator probed this point with the company official.

Finally, the internal agency memorandum documenting the "Findings of the Investigation" reported that the Vice President/General Manager of Welex stated that the company's "foreign competition is minimal." C.A.R. 21. The internal agency memorandum concluded that the "[p]redominant cause of [the] layoffs" at Welex's Blue Bell plant was "unrelated to imports." C.A.R. 20.

The Labor Department's "Petition Log Sheet" indicates that the agency contacted the Workers on March 27, 2008. *See* A.R. 7. However, the administrative record is devoid of evidence

---

[9]The agency investigator similarly did not explore a key assertion which was logically implicit in the company official's statement, which the agency accepted – that is, the implicit assertion that there was no appropriate space to be had in Pennsylvania, and that the only appropriate space was in North Carolina.

of any such communication. The agency thus sought no further information or clarification from the Workers as to their claims.

With no further inquiry, the Labor Department denied the Workers' TAA/ATAA petition on April 18, 2007 – even though the agency had published its Federal Register notice of the *initiation* of the investigation a mere eight days earlier. *Compare* A.R. 22-24 (dated April 18, 2007) (denial of petition) *with* 72 Fed. Reg. at 17,938 (April 10, 2007) (notice of receipt of petition and initiation of investigation) (A.R. 17-18). The Federal Register notice of the initiation of the investigation advised that the Workers could request a public hearing on their petition, and that other "[i]nterested persons" could submit written comments, provided that all requests for hearings and comments were filed "not later than April 20, 2007" – a deadline which was two days *after* the agency had already denied the Workers' petition. *See* 72 Fed. Reg. at 17,938.[10]

In its official Negative Determination Regarding Eligibility to Apply for Worker Adjustment Assistance and Alternative Trade Adjustment Assistance, the Labor Department stated that Welex's sales "increased substantially in 2006 compared with 2005 and thus were not adversely affected by imports." A.R. 23. The agency thus ruled that there was no evidence that increased imports of "articles like or directly competitive with" the equipment produced by the company had resulted in layoffs; nor did the agency find evidence of a "shift in production" to a foreign country. A.R. 22-23. *See also* 72 Fed. Reg. at 26,425 (notice of denial of petition) (same). Instead, the Labor Department

---

[10]In other words, the Labor Department denied the Workers' petition even before the time had expired for the Workers to seek a hearing on that petition. *Compare* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1315 (noting that, in that case, "the agency's Federal Register notice of the initiation of the investigation invited the Workers to seek a hearing on a petition that the agency had already denied").

concluded that "[t]he dominant cause of worker separations at Blue Bell in early 2007 [was] the complete transfer of production to another manufactory which is domestically located." A.R. 23.

The Labor Department sent copies of its Negative Determination to the Workers, along with a standard form letter advising them of their right to seek administrative reconsideration. That letter said nothing about the Workers' right to challenge the Labor Department's denial of their TAA/ATAA petition in court without first seeking reconsideration before the agency. A.R. 25-28.[11]

B. The Labor Department's Consideration of the Workers' Request for Reconsideration

The Workers promptly sought reconsideration of the Labor Department's denial of their TAA/ATAA petition. In their request for reconsideration, the Workers aimed to clarify and further substantiate facts that they thought may have been overlooked during the agency's initial investigation.

In their request for reconsideration, the Workers reiterated to the Labor Department that they had been told by Welex officials that their layoffs were due to competition from increased imports. A.R. 35. To further document their claim and to help establish Welex's financial status leading up to the layoffs, the Workers submitted for the Labor Department's consideration a detailed formal statement from the Trustee/Business Agent of their local union, which confirmed that Welex officials indeed had informed workers that the relocation of company manufacturing operations, and

_____

[11]*See* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1317 (criticizing Labor Department's failure to advise workers whose TAA petition had been denied that they could seek immediate judicial review rather than administrative reconsideration by the agency); *see also* Former Employees of Int'l Business Machines v. U.S. Sec'y of Labor, 29 CIT 1360, 1370, 403 F. Supp. 2d 1311, 1321 (2005) (same) ("IBM I").

the attendant layoffs of the Blue Bell employees, were due to both "domestic and overseas

competition":

> I was present during negotiations between Welex Inc. and Teamsters Local # 384 in
> 2005. At the negotiations it was stated several times that Welex was having financial
> difficulties due to the loss of several million dollars over the years 2004 and 2005.
> Welex claimed that these losses were due to *competition overseas* as well as
> domestic . . . and asked help from our membership to do whatever it could to help
> Welex regain financial stability and keep what [Welex's President] referred to as the
> "family" from having to either close or possibly move. . . .
>
> Having heard threats of moving before, we asked if our auditors could have access
> to the financial books of Welex to determine if, in fact, they were being honest about
> their losses. Our auditors did check the books and relayed the fact that Welex did
> indeed have losses in the millions in years 2004 and 2005. As a result of this
> information our Members ratified a contract in 2006 . . . [which] had a wage and
> benefit re-opener for January 2007 whereby we had the right to negotiate new wages
> based on the profitability of Welex in 2006.
>
> When it came time to negotiate the wage and benefit re-opener in December of 2006
> Welex informed us that they would be moving to North Carolina (even though
> profitable in 2006) so they could *cut costs in order to compete with domestic and
> overseas competition.*

A.R. 36 (emphases added).

The Labor Department was unmoved. The agency took no steps to investigate the

representations in the Workers' request for reconsideration or in the union official's formal

statement. Nevertheless, more than six weeks passed before the agency notified the Workers that

it was denying their request.

In its Dismissal of Application for Reconsideration, the Labor Department stated only that

"[t]he application did not contain new information supporting a conclusion that the determination

was erroneous, and also did not provide a justification for reconsideration of the determination that

was based on either mistaken facts or a misinterpretation of facts or of the law." 72 Fed. Reg.

39,080; A.R. 39, 42.  The agency's letter to the Workers shed at least somewhat more light on the basis for the agency's decision, stating that "[w]hen assessing eligibility for TAA, the Department exclusively considers sales, production, imports and shifts in plant production abroad during the relevant time period (one year prior to the date of the petition)."  A.R. 40-41.  There is, however, no indication that the agency considered the extent to which the union official's detailed statement cast doubt on the credibility of statements made by Welex officials on which the agency's decisionmaking had relied (on such critical topics as company profitability and the nature and extent of foreign competition).  Instead, the Labor Department's letter to the Workers simply repeated the agency's earlier conclusion that "the predominant cause of worker separations at the subject firm was related to a transfer in production from Blue Bell, Pennsylvania to another domestic facility and therefore imports did not contribute importantly to the layoffs at the subject plant."  *Id*.

This action ensued.  In lieu of filing an Answer with the Court, the Government sought, and was granted, a voluntary remand to conduct a further investigation and to make a redetermination as to the Workers' eligibility for TAA and ATAA benefits.

### C.  The Labor Department's Investigation on Remand

On remand, the Labor Department for the first time began to closely scrutinize the Workers' representations and the information supplied by Welex, and to seek to reconcile the two.

The Labor Department requested that Welex provide production data (which it had failed to submit in the agency's earlier investigation), as well as more detailed sales data;[12] and the agency

---

[12]On remand, the Labor Department also changed the period for which it sought information. Because the Workers' petition was filed on March 26, 2007, the agency properly sought sales and

repeatedly pressed for clarification of the company's responses. *See*, *e.g.*, C.S.A.R. 1, 4, 7, 12-15, 17, 29-31, 38, 48. The agency also compared the company data supplied in the initial investigation to that provided in the course of the remand investigation, and probed apparent discrepancies. *See*, *e.g.*, C.S.A.R. 30-31, 38, 48. In addition, the Labor Department informed the Workers' counsel of the data that the agency was seeking from Welex, and solicited the Workers' recommendations as to "any request[s] for additional information" which the agency should seek from the company. *See* S.A.R. 21-22.

The Workers' counsel responded with a suggested list of questions for Welex. *See* S.A.R. 23-25. In addition, the Workers submitted for the Labor Department's consideration an affidavit by one of the petitioners in which he attests that an attorney for Welex advised him that the company experienced financial losses in 2004, 2005, and 2006, and that the company's "devastating financial losses" and the relocation of manufacturing operations to North Carolina "were due in large part to competition from imports, particularly those from China." S.A.R. 26-28. When the Labor Department sought to verify the statements in the petitioner's affidavit, Welex's counsel confirmed that, indeed, in the course of January 2007 negotiations on behalf of the company, he had stated that Welex had "lost money in the recent past, specifically 2005 and 2006." C.S.A.R. 52-53. However,

---

production data for January through March of 2006 and 2007 (rather than only January and February of the two years, as the agency did in its initial investigation). *Compare*, *e.g.*, C.S.A.R. 7 *with* C.A.R. 12. *See also* 73 Fed. Reg. at 39,045 (S.A.R 65) (explaining that "[t]he TAA/ATAA petition date is March 26, 2007. Therefore, the Department must determine whether imports of plastic extrusion equipment . . . have increased during March 26, 2006 through March 25, 2007 (relevant period) compared to the base period (the four quarters immediately prior to March 26, 2006).").

he further asserted that he had "absolutely no recollection whatsoever of having ascribed foreign competition as the basis for [those] losses." *Id.*[13]

The picture came into sharp focus following a telephone conversation between a senior Labor Department official and the President of Welex. According to the internal memorandum memorializing that call, in the course of his conversation, the senior Labor Department official learned that, in fact, although company sales and production had increased overall in 2006, sales dropped in the second half of that year after a very strong first half. C.S.A.R. 54; 73 Fed. Reg. at 39,045. He also confirmed that only a handful of U.S. companies produce plastic extrusion machinery domestically. C.S.A.R. 54.

In light of information obtained in the telephone call, the senior Labor Department official concluded that – because Welex machinery is manufactured to order, and in light of the durable nature of the machinery – "a survey [of Welex customers] would not accurately reflect the impact of imports." C.S.A.R. 54; S.A.R. 55-57, 66; 73 Fed. Reg. at 39,045-46. Instead, because Welex "accounts for a major share of the [domestic] industry," the senior Labor Department official

---

[13]To be sure, nothing in the Welex attorney's statement to the Labor Department suggested that the cause of the company's losses and the relocation of manufacturing operations to North Carolina was anything other than "competition from imports, particularly those from China," as the affidavit filed by the Workers indicated. *Compare* C.S.A.R. 53 *with* S.A.R. 27. The attorney attested only that the relocation was driven by "the high cost of doing business in Pennsylvania" (including labor and other costs), that he had no specific recollection of attributing the company's losses and the relocation of manufacturing operations to foreign competition in a conversation with one of the petitioning Workers, and that "it is not the kind of thing [he] would be likely to say." C.S.A.R. 53.

determined that data on "aggregate imports" would be a more reliable indicator of the impact of foreign competition on the company.  C.S.A.R. 54; S.A.R. 55-57, 66; 73 Fed. Reg. at 39,046.[14]

Based on the senior Labor Department official's analysis, the agency consulted two tables compiling official tariff and trade data from the U.S. Department of Commerce and the U.S. International Trade Commission, which document imports of extruder systems into the United States during the relevant time period.  Those data indicate that imports rose significantly in 2007.  S.A.R. 55-57, 66-67; 73 Fed. Reg. at 39,046.  In addition, the agency reviewed information provided by an industry trade association, to gain a better understanding of the structure of the industry. S.A.R. 58-60, 63; 73 Fed. Reg. at 39,046.

As a result of the remand investigation, the Labor Department found that Welex's Blue Bell plant "ceased operations in January 2007 and permanently closed."  The agency therefore concluded that the Workers satisfied the TAA criterion concerning worker separations from a subject firm.  S.A.R. 64; 73 Fed. Reg. at 39,045.  On remand, the Labor Department further found that "although sales and production at [Welex] increased in the calendar year 2006 from calendar year 2005 levels, sales orders decreased in the latter part of 2006 and into the earlier part of 2007."  The agency thus concluded that Welex's "sales and production declined absolutely" during the relevant period, satisfying that TAA criterion.  S.A.R. 64; 73 Fed. Reg. at 39,045.

In addition, the Labor Department was required to determine "whether imports of plastic extrusion equipment (or articles like or directly competitive with the plastic extrusion equipment

---

[14]According to the internal memorandum memorializing the phone conversation, the Welex official conceded that "[t]here [were] imports of extrusion equipment but [he] didn't feel that imports impacted his company."  C.S.A.R. 54.

produced at [Welex's Blue Bell plant])" increased during the relevant period. If so, the agency also had to determine "whether the increased imports contributed importantly to . . . [Welex's] sale[s] and/or production declines and workers' separations." S.A.R. 65; 73 Fed. Reg. at 39,045. Based on the agency's research conducted in the course of the remand (as discussed above), the Labor Department concluded that there was "a significant increase in imports of plastic extrusion equipment (and articles like or directly competitive with plastic extrusion equipment produced at [Welex])" during the relevant period. S.A.R. at 66-67; 73 Fed. Reg. at 39,045-46. The agency further concluded that "the period of increased imports corresponds with the period during which [Welex's] sales orders declined," and that because Welex's sales "constitute a meaningful portion of the U.S. plastic extrusion equipment market," "increased U.S. imports would likely have had a significant impact" on the company. The Labor Department thus determined that the Workers satisfied the TAA criterion concerning the impact of increased imports on sales and/or production, as well as worker separations. S.A.R. 67; 73 Fed. Reg. at 39,046.

Finally, because "[a] significant number of [Welex] workers . . . are age 50 or over and possess skills that are not easily transferable," and because "[c]ompetitive conditions within the industry are adverse," the Labor Department further determined that the criteria for certification for Alternative Trade Adjustment Assistance were also satisfied. S.A.R. 67; 73 Fed. Reg. at 39,046.

The Labor Department thus ultimately concluded, on remand, that "there was a total separation of a significant number or proportion of workers at the subject firm, that there were subject firm sales and production declines, and that increased imports of articles like or directly

competitive with plastic extrusion equipment produced at the subject firm contributed importantly to the subject firm declines and the workers' separations." S.A.R. 68; 73 Fed. Reg. at 39,046.

Accordingly, on remand, the Labor Department reversed its two previous denials, granting the Workers' TAA/ATAA petition, and certifying them as eligible to apply for TAA and ATAA benefits:

> All workers of Welex, Inc., Blue Bell, Pennsylvania, who became totally or partially separated from employment on or after March 26, 2006, through two years from the issuance of this revised determination, are eligible to apply for Trade Adjustment Assistance under Section 223 of the Trade Act of 1974, and are eligible to apply for alternative trade adjustment assistance under Section 246 of the Trade Act of 1974.

S.A.R. 68; 73 Fed. Reg. at 39,046.


### III.  Analysis

In this case, as in so many other TAA/ATAA cases appealed to the court in recent years, the Workers' dogged persistence ultimately paid off. The Workers are, of course, gratified that the Department of Labor finally granted their petition. However, the ready availability of data establishing their eligibility only serves to underscore the fact that the Labor Department could – and should – have certified them in the first place, within 40 days of the receipt of their petition. *See* 19 U.S.C. § 2273 (Supp. II 2002) (requiring agency determination "[a]s soon as possible," "but in any event not later than 40 days" after filing of petition).

In sum, as set forth in greater detail below, it exalts form over substance to characterize as an "investigation" the Labor Department's superficial review of the Workers' petition at the agency

level.[15]  The fact that the Workers were forced to press their claim for months on end, past the initial

investigation and through administrative reconsideration, and – ultimately – had to haul the Labor

Department into court to compel the agency to take a hard look at their claim demonstrates the

agency's persistent failure to fulfill both its statutory mandate and its obligations under its own

regulations, which affirmatively require the agency to "conduct [its] investigation[s] with the utmost

regard for the interests of the petitioning workers" and to "marshal all relevant facts" before making

its determinations granting or denying workers' petitions.  *See* Stidham v. U.S. Dep't of Labor, 11

CIT 548, 551, 669 F. Supp. 432, 435 (1987) (citation omitted); 29 C.F.R. § 90.12 (2007).[16]

### A.  The Labor Department's Failure to Identify and Resolve Discrepancies and Inconsistencies in Information Provided to It

The Labor Department's initial investigation consisted of little more than skimming the four

pages of the Workers' petition, reviewing the information provided by Welex on the agency's

standard five-page "fill-in-the-blank" Business Confidential Data Request questionnaire, and

(apparently) a brief follow-up telephone conversation with Welex's Vice President/General

Manager.  A.R. 1-4; C.A.R. 11-15, 21.[17]  The Labor Department investigator made no attempt to

---

[15]As BMC observed, an "investigation" is defined as a "detailed examination" or "a searching inquiry," "an official probe."  Webster's Third New International Dictionary (Unabridged) 1189 (2002).  *See* BMC, 30 CIT at ____ n.29, 454 F. Supp. 2d at 1324 n.29.  The Labor Department's track record in TAA cases in this court belies any suggestion that the agency's typical initial review of a TAA petition can fairly be described as an "investigation."  *Id.*

[16]All citations to regulations are to the 2007 edition of the Code of Federal Regulations.

[17]As discussed above, although there is no documentation in the record of such a conversation, the internal agency memorandum setting forth the "Findings of the Investigation" reflects information attributed to Welex which is not found elsewhere in the record.  *See* n.8, *supra*.

resolve several key discrepancies and inconsistencies in the information on which the agency relied to deny the Workers' TAA/ATAA petition. Indeed, there is no indication that the investigator ever even recognized them.

Chief among these discrepancies and inconsistencies was the reason for the closure of the Pennsylvania plant and the move to North Carolina. Thus, for example, the Labor Department investigator never questioned Welex's Vice President/General Manager as to why the space constraints of an existing facility in Pennsylvania would compel a full-scale relocation of more than 400 miles. If the layout of the existing plant were the true concern, there is no apparent logical reason why appropriate space would not have been identified in Pennsylvania (or certainly somewhere short of North Carolina). But the Labor Department investigator never broached the issue. Similarly, the agency investigator failed to confront the Welex official with the news article in which he is quoted attributing the plant closure and relocation to foreign competition, and where – contrary to his later account – he says virtually nothing about layout and space issues.[18] *Compare* A.R. 4 (news article quoting Welex Vice President/General Manager attributing relocation, at least in part, to pressure of foreign competition) *with* C.A.R. 21 (internal agency memorandum indicating that Welex Vice President/General Manager attributed relocation to problems with layout of Blue Bell plant).[19]

_____

[18]In fact, the Times Herald news article actually quotes Welex's Vice President/General Manager disclaiming space as a significant issue: "Our primary reason for going [to North Carolina] is to be more competitive, because *the facility we're putting together is about the same size*, but much more efficient for our operations." A.R. 4 (emphasis added).

[19]As a matter of pure logic, the mere fact that a company states that layoffs are part of a "restructuring" of the company, or are designed to "increase efficiency" or to promote operation "in

The Labor Department investigator also never questioned Welex about the statement in the Workers' petition (submitted under oath), attesting that company representatives had told them that foreign competition was to blame for the Blue Bell plant's closure and the relocation of manufacturing operations to North Carolina, where production costs were lower. Indeed, there is no indication in the record that the investigator even mentioned the Workers' sworn statement in his communications with Welex.

In short, the Labor Department not only made no attempt to reconcile the discrepancies between the Workers' statement that the relocation was due to foreign competition and a Welex official's attribution of the relocation to problems with the layout of the Blue Bell plant – what is worse, the agency made no attempt to resolve the apparent discrepancies between the two conflicting accounts given by that same Welex official.

Just as the Labor Department erred in failing to confront Welex with the Workers' statements, so too the agency erred by not confronting the Workers with the general gist of the company's representations. The agency investigator thus deprived the Workers of any opportunity

---

a cost-effective and timely manner" says nothing about whether or not the layoffs are attributable to the pressure of low-cost imports or other foreign competition. As a general principle, companies are *always* striving to operate in an efficient, cost-effective, and timely manner. For purposes of a TAA/ATAA analysis, the relevant question is: "*Why*? Why is the company now particularly concerned about the efficiency and cost-effectiveness of its operations? Is the company's concern being driven by increased imports, or other foreign competition?" *See*, *e.g.*, BMC, 30 CIT at ____ n.32, 454 F. Supp. 2d at 1326-27 n.32 (criticizing Labor Department for accepting such statements by employers as proof that layoffs not linked to increased imports); Former Employees of Int'l Business Machines v. U.S. Sec'y of Labor, 31 CIT ____, ____ at n.72, 483 F. Supp. 2d 1284, 1335 at n.72 (2007) (same) ("IBM II").

to comment on the information supplied by the company, or to procure and proffer evidence to refute Welex's assertions.

In addition to the dispute as to the reasons for the closure of the Pennsylvania plant and the relocation to North Carolina, there was yet another significant discrepancy in the record which the Labor Department either overlooked or chose to ignore. As section II.A above explains, Welex's Vice President/General Manager apparently told the Labor Department that the company's dramatic "dip in sales for January-February 2007" (compared to January-February 2006) was due to the relocation of manufacturing operations during that period in 2007. *See* C.A.R. 21. It is easy to understand why the relocation in early February 2007 would have affected *production*. But it is far from clear why the relocation would have had a major impact on *sales*, as Welex's Vice President/General Manager insisted, in light of the fact that the company's administrative and managerial headquarters remained in Pennsylvania. *See* C.A.R. 11, 20. Yet this inconsistency too escaped the agency's scrutiny.

The Labor Department's handling of the Workers' request for reconsideration was even more troubling. Together with their request for reconsideration, the Workers presented the agency with a detailed formal statement by a union official. *See* A.R. 36. The contents of that statement should have raised some fairly grave doubts about the credibility of the company's representations to the agency on topics such as company profitability and foreign competition – critical representations, on which the agency had predicated its decisionmaking. The Labor Department nevertheless made no attempt to resolve the obvious discrepancies and inconsistencies between the statements of the union official and those of Welex, and, rather incredibly, did nothing further to investigate the

Workers' claims – not even a phone call or an e-mail message to either the Workers or to Welex. *Compare* A.R. 35-36 *with* 72 Fed. Reg. 39,080; A.R. 39-42.  Instead, the agency continued to rely on the bald, unsworn, uncorroborated, and unverified statements of a Welex executive who had himself given at least two inconsistent statements on the topic of the reasons for the company's closure of the Blue Bell plant and its relocation of manufacturing operations to North Carolina.

Taken as a whole, the Labor Department's investigation in this case was yet another classic illustration of "the agency's persistent failure to verify the accuracy of the information on which it relies," as well as "its pattern of turning a blind eye to obvious inconsistencies and discrepancies in the record before it."  BMC, 30 CIT at ____, 454 F. Supp. 2d at 1337.

Only after this action was filed and the voluntary remand granted did the Labor Department begin to seriously probe the merits of the Workers' petition.  Even the cursory recitation of the facts above makes it clear that the Labor Department could – and should – have done much more much earlier to obtain the necessary information, by scrutinizing the company's statements, seeking clarification where necessary, and pressing to resolve the obvious discrepancies and inconsistencies in the record before it, consistent with its legal obligation to "marshal all relevant facts" before reaching its determination.  *See* 29 C.F.R. § 90.12.

B.  The Labor Department's Over-Reliance
on Employer-Provided Information

Not only did the Labor Department consistently fail to identify and reconcile inconsistencies and discrepancies in the information provided to it in the course of its investigation, it also consistently credited the information proffered by Welex, and rejected that provided by the Workers, without articulating any rational basis for that action.  *See generally* BMC, 30 CIT at ____, 454 F. Supp. 2d at 1328-37 (discussing the agency's proclivity in TAA/ATAA investigations to rely on employer-provided information to the exclusion of that provided by petitioning workers, surveying relevant caselaw, and highlighting various incentives and motivations that might influence accuracy and reliability of employer-provided information).

The reliability of the information provided by Welex was undermined both by inherent internal inconsistencies (including the Vice President/General Manager's conflicting statements about the factors behind the plant closure and the relocation of manufacturing operations, the lack of any reasoned explanation for the company's inability to find appropriate space in the Pennsylvania locale, and the absence of a logical connection between the company's drop in *sales* and the relocation of its *manufacturing* operations), as well as by the fact that it was fundamentally in conflict with information supplied by the Workers on key points (such as company profitability and the nature and extent of import competition).

The Labor Department's unquestioning reliance on the information provided by Welex is particularly difficult to square with the agency's wholesale failure to contact the Workers to probe the truth of their assertions as well the information supplied in the union official's formal statement,

and to solicit their comments on the company's general representations. As explained in section II. A above, although the Labor Department's "Petition Log Sheet" indicates that the agency contacted the Workers, there is nothing in the administrative record to document that any such communication ever actually occured. *See* A.R. 7.

In short, despite the inherent discrepancies and inconsistencies in the (unsworn) information provided by Welex, and even though that information was wholly at odds on critical points with detailed, specific information supplied by the Workers (some of it under oath), and notwithstanding the fact that the agency made no effort whatsoever to reconcile any of those numerous discrepancies and inconsistencies – or, indeed, even to contact the Workers – the Labor Department nevertheless chose to rely exclusively on information supplied by the company to deny the Workers' petition, not merely once, but twice.

The Labor Department is entitled to base its TAA/ATAA determinations on statements of company officials "if the Secretary *reasonably* concludes that those statements are creditworthy" *and* if the statements "are not contradicted by other evidence." *See* Former Employees of Marathon Ashland Pipe Line, LLC v. Chao, 370 F.3d 1375, 1385 (Fed. Cir. 2004). But this was not such a case. As the Court of Appeals has held, where – as here – the evidence is in conflict, the agency is "precluded . . . from relying on the representations by the employer" and is required to "take further investigative steps before making [its] certification decision." *Id.* (emphases added).

The Labor Department's flawed investigative methodology in this case took no account of the Court of Appeals' caution in Marathon Ashland. As BMC observed, "there is no apparent rational basis for treating information supplied by employers as inherently and necessarily more

reliable and authoritative than that provided by petitioning workers – particularly where the employer's information is unsworn, unverified, and uncorroborated, or where it conflicts with information submitted by the petitioning workers." BMC, 30 CIT at ____, 454 F. Supp. 2d at 1334.[20] This is yet another disturbing case where Labor Department investigators "seem[ed] almost gullible in their willingness to accept at face value virtually *anything* [the] employer sa[id] – . . . without even confronting the employer with other, conflicting information provided by [the] petitioning workers (. . . [and, here, even by] the employer itself)." *Id*., 30 CIT at ____, 454 F. Supp. 2d at 1331.

---

[20]As BMC explained, just as petitioning workers may have motivations to stretch the truth, so too employers "have certain inherent incentives to be less than candid and fully forthcoming." BMC, 30 CIT at ____, 454 F. Supp. 2d at 1332. For example, particularly in today's climate, employers may be reluctant to acknowledge layoffs and their underlying causes, for political, economic, and public relations reasons. *See id*., 30 CIT at ____, 454 F. Supp. 2d at 1332-33. In other cases, the employer may not understand that – unlike the unemployment compensation system – the employer has no financial stake in the outcome of a TAA petition. *Id*., 30 CIT at ____, 454 F. Supp. 2d at 1333.

The reliability of employer-provided information is also affected by the availability of the requisite information, as well as the knowledge and competence of the Labor Department's source(s) at a company. Thus, some employers may lack ready access to the information that the Labor Department seeks. BMC, 30 CIT at ____, 454 F. Supp. 2d at 1333. And, in other cases, "the company officials who respond to the Labor Department's inquiries may not intend to mislead the agency, but instead may simply lack the requisite knowledge of the company's product lines, markets, and operations." *Id*., 30 CIT at ____, 454 F. Supp. 2d at 1334. Ultimately, of course, it is the Labor Department which bears the responsibility for ensuring the accuracy and reliability of the sources on which it chooses to base its TAA/ATAA determinations.

#### C.    The Labor Department's Failure to Consult
Other Publicly-Available Sources of Information

Quite apart from the Labor Department's blind faith in employer-provided information, its failure to contact the petitioning Workers, and its willingness to overlook or ignore contradictory evidence in the record before it, there was yet  another problem with the  agency's  investigation: Here, as in numerous other cases, agency investigators failed to make timely use of valuable sources of information that are readily available to them. *See generally* BMC, 30 CIT at _____, 454 F. Supp. 2d at 1337-39 (criticizing agency's routine failure to consult publicly-available sources of information, and collecting illustrative cases).

It is shocking how easily the Labor Department was able to obtain the critical information on imports which resulted in the Workers' certification.  As discussed in section II.C above, following a conversation with a Welex official, a senior agency official determined that – given the nature of the industry and the company's role in it – data on aggregate imports of plastic extruder systems would better reflect the impact, if any, of foreign competition on Welex's sales and production (rather than a customer survey, or continued agency reliance on the uncorroborated representations of company representatives). C.S.A.R. 54; S.A.R. 55-57, 66; 73 Fed. Reg. at 39,046.

With just a few quick clicks of a computer mouse, the Labor Department was able to access a public website and obtain the requisite government-compiled import statistics, which confirmed that aggregate imports increased significantly during the relevant period, and coincided with the significant drop in Welex's sales orders.  S.A.R. 55-57, 67.  The Labor Department therefore concluded that "increased U.S. imports would likely have had a significant impact on the subject

firm" – a key prerequisite to certification of the Workers here.  S.A.R. 67; 73 Fed. Reg. at 39, 046.

Again, it is black letter law that the Labor Department is obligated to "conduct [its] investigation[s] with the utmost regard for the interests of the petitioning workers" and to "marshal all relevant facts" before making its determinations granting or denying displaced workers' petitions. *See* Stidham, 11 CIT at 551, 669 F. Supp. at 435; 29 C.F.R. § 90.12.  In light of those obligations, the resourcefulness that the senior agency official ultimately demonstrated here should be not the exception, but the rule, in TAA/ATAA investigations.[21]

### IV.  Conclusion

The Labor Department's failure to fulfill its solemn obligations to the Workers in this case cost them dearly.  Delays in TAA/ATAA certification can take a devastating human toll.  *See* Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor, 27 CIT 1930, 1942, 298 F. Supp. 2d 1338, 1349 (2003) (explaining that "as a general principle, the effectiveness of [TAA] depends upon its timeliness," and discussing the often dramatic consequences of unemployment) ("Chevron III").

Although it was belated, the Labor Department performed a proper investigation on remand; and a review of the administrative record as a whole indicates that the agency's Revised Determination on Remand is supported by substantial evidence, and is otherwise in accordance with

---

[21]*See*, *e.g.*, Brad Brooks-Rubin, "The Certification Process for Trade Adjustment Assistance: Certifiably Broken," 7 U. Pa. J. Labor & Emp. L. 797, 822-23 (2005) (arguing that, in TAA investigations, agency should be required to consult, in addition to information supplied by employer, "objective, third party evidence" such as "trade-specific publications, trade data for an industry, consultations with industry experts, etc.").

law.  *See* 73 Fed. Reg. 39,045 (July 8, 2008).  The Department of Labor's Remand Determination

certifying the Workers for TAA and ATAA is therefore sustained.

     Judgment will enter accordingly.


                                                /s/ Delissa A. Ridgway
                                                  Delissa A. Ridgway
                                                      Judge


Decided:  December 23, 2008
        New York, New York